SHELDON A. E. ROSENTHAL AND DOROTHY L. ROSENTHAL, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3257-73, 3258-73, 3298-73, 3894-73.   Filed January 13, 1975.

*Russell R. Stepke,* for the petitioners.
*F. Patrick Matthews,* for the respondent.

WILES, *Judge:* Respondent determined deficiencies in petitioners' income tax as follows:

| Petitioners | Docket No. | Year | Amount |
|---|---|---|---|
| Sheldon A. E. and Dorothy L. Rosenthal | 3257-73 | 1969 | $2,888.87 |
| Jon R. and Linda Hillegas | 3258-73 | 1969 | 1,925.54 |
| William R. and Juanita F. McGregor | 3298-73 | 1969 | 1,805.64 |
| William R. and Juanita F. McGregor | 3894-73 | 1970 | 1,788.92 |

The cases were consolidated for trial. The issue is whether petitioners may exclude from their gross incomes as fellowship or scholarship grants under section 117 [2] amounts received as residents in surgery at Wood Veterans Administration Hospital and Milwaukee County General Hospital.

### FINDINGS OF FACT

Some facts were stipulated and are found accordingly.

Sheldon A. E. Rosenthal (hereinafter petitioner) and Dorothy L. Rosenthal, husband and wife, were legal residents of Encino, Calif., when their petition was filed. Jon R. Hillegas (hereinafter petitioner) and Linda Hillegas, husband and wife, were legal residents of Phoenix, Ariz., when their petition was filed.

---

[1] Consolidated herewith are the following cases: Jon R. Hillegas and Linda Hillegas, docket No. 3258-73; William R. McGregor and Juanita F. McGregor, docket Nos. 3298-73 and 3894-73.

[2] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

William R. McGregor (hereinafter petitioner) and Juanita F. McGregor, husband and wife, were legal residents of Wauwatosa, Wis., when their petition was filed. Petitioners filed joint income tax returns for the years in question with the district director of internal revenue in Milwaukee, Wis.

During 1969 and 1970, each petitioner was a physician licensed to practice medicine in Wisconsin. Each petitioner was also a general surgical resident participating in the Marquette Affiliated Surgical Residency Program (hereinafter MASRP) at Milwaukee County General Hospital (hereinafter Milwaukee Hospital) and Wood Veterans Administration Hospital (hereinafter Veterans Hospital).

MASRP was, during 1969 and 1970, a 4-year surgical training program operated by the Marquette University Graduate School (hereinafter Marquette), in affiliation with Marquette Medical School and six major hospitals in the Milwaukee, Wis., area. Petitioner Rosenthal was a second-year surgical resident in MASRP from January 1969 through June 1969, and a third-year surgical resident from July 1969 through December 1969. Petitioner Hillegas was a second-year surgical resident from January 1969 through August 1969, and a third-year surgical resident from August 1969 through December 1969. Petitioner McGregor was a first-year surgical resident from January 1969 through June 1969, a second-year surgical resident from July 1969 through June 1970, and a third-year surgical resident from July 1970 through December 1970.

A MASRP appointment also enabled a resident to enter the master of science in surgery degree program of Marquette. Petitioner Rosenthal was a candidate for that degree from January 1, 1969, to May 31, 1969. Petitioner Hillegas was a candidate for that degree during all of 1969. Petitioner McGregor was a candidate for that degree during all of 1969 and 1970.

During 1969, petitioner Rosenthal received $2,122.64 from the County of Milwaukee and $6,283.81 from the United States Veterans Administration for participation in the surgical residency program at Milwaukee Hospital and Veterans Hospital, respectively.

During 1969, petitioner Hillegas received $6,259.35 from the County of Milwaukee and $2,027.70 from the United States Veterans Administration for participation in the surgical

residency program at Milwaukee Hospital and Veterans Hospital, respectively.

During 1969, petitioner McGregor received $5,858.64 from the United States Veterans Administration for participation in the surgical residency program at Veterans Hospital. During 1970, petitioner McGregor received $5,527.20 from the County of Milwaukee and $1,103.97 from the United States Veterans Administration for participation in the surgical residency program at Milwaukee Hospital and Veterans Hospital, respectively.

During their general surgical residencies, petitioners were assigned to the affiliated hospitals under a standard rotation schedule. Both the rotation schedule and the residency program as a whole were controlled by the faculty of Marquette and the Marquette School of Medicine.

While on rotation at the affiliated hospitals, petitioners received payments from the particular hospital to which they were assigned at that time and were paid at a rate determined by that hospital. Petitioners and all MASRP residents received the same stipends, depending solely on level of progression through the residency program and the salary schedule of their then-assigned hospital. Individual need was accordingly not considered in determining the amount of payments made to each resident. The annual rate of payments made by Milwaukee Hospital to all residents, including petitioners, during the years in question was as follows:

LEVEL OF RESIDENT

| Year | I | II | III | IV |
|------|------|------|------|------|
| 1969 _____ | $7,254 | $7,854 | $8,454 | $9,074 |
| 1970 _____ | 7,429 | 8,030 | 8,630 | 9,249 |

Comparable payments by Veterans Hospital were as follows:

LEVEL OF RESIDENT

| Year | I | II | III | IV |
|------|------|------|------|------|
| 1969 _____ | $7,600 | $8,200 | $8,800 | $9,400 |
| 1970 _____ | 8,130 | 8,555 | 8,980 | 9,529 |

Not all MASRP surgical residents were candidates for the master of science in surgery degree. However, no distinction in payments was made by participating hospitals between degree candidates and those who were not.

Either or both hospitals provided petitioners and other MASRP residents, without cost, with medical insurance, malpractice insurance, paid sick leave, paid annual vacation, a $25 annual uniform allowance, free meals when working extended hours, and, under certain circumstances, reimbursement for travel expenses incurred for medical conventions.

The Marquette School of Medicine faculty constituted a majority of the medical staff of Veterans Hospital and all of the medical staff of the Milwaukee Hospital during 1969 and 1970. Patient care at both hospitals was done by teams of medical students, interns, and residents under the direction of attending physicians. Each team was responsible for a given number of patients, but ultimate medical responsibility for such patients lay with the attending physicians. Residents and other team members thus performed medical and surgical services under the supervision and control of attending physicians. Each team member participated in evaluation, care, and treatment of team patients, with increasing responsibility being assigned for each year of resident training. Residents, interns, and medical students were assigned night duty at the hospitals to care for team patients and provide emergency room surgical services. When assigned to a surgical service, surgical residents spent approximately every third night on call at the hospital. The attending physician for each team was not usually at the hospital with the team when it was on call at night.

Surgical residents worked 8 to 10 hours a day, Monday through Friday, and on Saturday, Sunday, and holiday mornings. Both hospitals estimated that 75 percent of that time was spent in clinical patient care and that 25 percent was spent in formal classroom activities. Surgical teams made three rounds to check their patients each day, only some of which were accompanied by an attending physician. As general surgical residents, petitioners ordered prescriptions, wrote treatment orders for patient care, took patients' physicals and medical histories, ordered special reports (including consultations, X-rays, and clinical laboratory analyses), assessed and diagnosed patients (subject to review by the attending physician), reviewed intern and medical student diagnoses, secured autopsy consents, wrote progress notes, wrote transfer notes, dictated case summaries for discharge notes, signed death certificates, commenced the administration of intravenous fluids, inserted nasal gastric tubes, scheduled

operating room appointments, prepared patients for operations, performed operations, assisted in operations, completed operating room worksheets, dictated operative notes, changed dressings, removed sutures, and performed autopsies. As the Acting Chief of Surgery at Milwaukee Hospital during 1970 stated at trial, "[A surgical resident] does those things that surgeons do."

During his 3 years of surgical residency, petitioner Rosenthal performed 233 operations as the responsible operating surgeon and 164 operations as the assisting surgeon. During his 4 years of general surgical residency, petitioner Hillegas performed 424 operations as the responsible operating surgeon and 574 operations as the assisting surgeon. During his 4 years of general surgical residency, petitioner McGregor performed 406 operations as responsible operating surgeon and 413 operations as the assisting surgeon. Many of these operations were performed during each petitioner's junior residency (first, second, or third year). Over 95 percent of general surgical procedures at Veterans Hospital and Milwaukee Hospital were performed by surgical residents, under resident physician supervision.

Classroom instructions required for the master of science in surgery degree were held Friday afternoons and Saturday mornings. All surgical residents, degree candidates or not, were expected to attend these conferences and lectures.

In the absence of a resident staff, Milwaukee Hospital could operate only if attending physicians greatly increased their workload or if other physicians were hired to replace the residents. If residents were not available at Veterans Hospital, the hospital would need to employ additional physicians, because "residents render much valuable service in the medical and hospital care of veteran patients."

OPINION

The issue is whether petitioners are entitled to exclude certain payments from their gross incomes as scholarships or fellowship grants under section 117.

Section 117(a)(1) excludes from gross income any amount received as a scholarship or fellowship grant. For individuals who are candidates for degrees, section 117(b)(1) provides, in part, that the exclusion of section 117(a)(1) shall not apply to "that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time

employment required as a condition to receiving the scholarship or the fellowship grant." That paragraph further provides that services required of all candidates as a condition for receiving a particular degree shall not be regarded as part-time employment. Section 1.117-4 of the Income Tax Regulations provides that certain payments or allowances will not be considered to be scholarship or fellowship grants under section 117, including:

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) Except as provided in paragraph (a) of §1.117-2 [relating to the limitation provided in sec. 117(b)(1)], any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. * * *

In *Bingler v. Johnson,* 394 U.S. 741, 751 (1969), the Supreme Court of the United States upheld the validity of this regulation and noted its consistency with "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients." In *Parr v. United States,* 469 F. 2d 1156, 1158 (C.A. 5, 1972), and *Hembree v. United States,* 464 F. 2d 1262, 1264 (C.A. 4, 1972), the courts stated that the primary purpose standard of section 1.117-4(c), Income Tax Regs., relates to the purpose for which the payments are made.

On the basis of the evidence in this record, we find that the payments in question constituted compensation for present services that were subject to the direction or supervision of the grantors.

Petitioners rendered extensive and valuable services to Milwaukee Hospital and Veterans Hospital, the effect of which was clearly to provide the "substantial *quid pro quo*" which the Supreme Court described in *Bingler v. Johnson, supra.* Both hos-

pitals estimated that resident physicians at their institutions spent 75 percent of their time in clinical patient care and only 25 percent of their time in formal classroom activities. Petitioners performed or assisted in hundreds of operations during the years in question, and, indeed, over 95 percent of general surgical procedures in Milwaukee Hospital and Veterans Hospital during 1969 and 1970 were performed by surgical residents, under attending physician supervision. Furthermore, petitioners spent many hours each week caring for patients on rounds and on call. If residents had not been available, Veterans Hospital would have had to employ additional physicians because residents rendered "much valuable service in the medical and hospital care of veteran patients." Similarly, in the absence of residents Milwaukee Hospital could have operated only if attending physicians had greatly increased their hours and workload or if other physicians were hired to replace the residents.

Besides the nature and extent of services rendered, two other factors support the conclusion that the payments constituted compensation. First, payments were based on length of service, not individual need. *Geral W. Dietz*, 62 T.C. 578 (1974); *Aloysius J. Proskey*, 51 T.C. 918 (1969). Second, petitioners received paid vacation leave, paid sick leave, medical and malpractice insurance, and other fringe benefits indicative of an employment relationship. *Irwin S. Anderson*, 54 T.C. 1547 (1970).

The purpose of the payments, therefore, was to provide compensation for services rendered.

Petitioners emphasize that MASRP, Milwaukee Hospital, and Veterans Hospital had a primary or at least significant purpose of training surgeons. Since the primary purpose of the payments was compensation, however, this argument is not persuasive. *Parr v. United States, supra; Hembree v. United States, supra.* Similarly, petitioners' participation in the master of science in surgery degree program does not outweigh the substantial services rendered to the hospitals, especially since no distinction was made in payments between residents who were degree candidates and those who were not.

Petitioners contend that section 117(b)(1), relating to part-time employment, is applicable, thereby precluding application of section 1.117-4(c) of the Income Tax Regulations. The limitation and exception of section 117(b)(1) becomes applicable

only if the payment in question has first been found to constitute a scholarship or fellowship grant. *Elmer L. Reese, Jr.,* 45 T.C. 407, 413 (1966), affirmed per curiam 373 F. 2d 742 (C.A. 4, 1967). Since the payments in this case were not scholarships or fellowship grants, section 117(b)(1) is accordingly inapplicable.

Petitioners also contend that section 1.117-4(c) of the Income Tax Regulations, even if applicable, does not adversely affect them because of the nature of the residency program and the stipend payments. We do not agree. That regulation has been held applicable to medical residents in many similar situations. See, e.g., *Hembree v. United States, supra; Quast v. United States,* 428 F. 2d 750 (C.A. 8, 1970); *Frederick Fisher,* 56 T.C. 1201 (1971); *Marvin L. Dietrich,* T.C. Memo. 1974-16, affirmed without opinion 503 F.2d 1379 (C.A. 8, 1974).

Petitioners also contend that *William Wells,* 40 T.C. 40 (1963), is controlling. In *Wells,* this Court found, at 40 T.C. 48, that the services in that case were "of limited usefulness to the hospital * * * [and] did not appreciably lighten the workload of the staff." *Wells* is accordingly distinguishable.

Finally, petitioners contend that their services were of limited usefulness to the hospitals because, for the years in question, they were generally only in the first or second years of the 4-year residency program. Although additional responsibilities were given to third- and fourth-year residents in MASRP, first- and second-year residents still performed substantial and valuable services for Milwaukee Hospital and Veterans Hospital. In *Parr v. United States, supra* at fn. 3, the United States Court of Appeals for the Fifth Circuit saw no significance in the fact that taxpayers therein were only first- and second-year surgical residents; similarly, we do not find it to be significant here.

We hold that petitioners are not entitled to exclude the payments in issue as scholarship or fellowship grants under section 117.

*Decisions will be entered for the respondent.*