T. CRAIG and JAYNE R. FERRILL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ferrill v. Commissioner
Docket No. 7562-71.
United States Tax Court
T.C. Memo 1975-179; 1975 Tax Ct. Memo LEXIS 192; 34 T.C.M. (CCH) 773; T.C.M. (RIA) 750179; June 9, 1975, Filed T. Craig Ferrill, pro se. C. Garold Sims, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined a $431.69 deficiency in petitioners' 1969 Federal income tax. The sole issue is whether T. Craig Ferrill (hereinafter petitioner) is entitled to exclude $300 per month of payments received as a medical resident from St. Paul Hospital as a fellowship grant under section 117(a)(1)(B) and (b)(2). [1]
FINDINGS OF FACT Some facts were stipulated and are found accordingly. Petitioner and Jayne R. Ferrill, husband and wife, resided in Irving, Texas, when their petition was filed. Their 1969 joint Federal income tax return was filed at the Austin Service Center, Austin, Texas. Petitioner, a medical doctor, *194 was licensed to practice medicine and surgery in Texas in August 1968. He completed an internship at St. Paul Hospital, Dallas, Texas on June 30, 1969. On July 1, 1969, petitioner began a three-year residency in general radiology at that hospital. St. Paul Hospital is primarily engaged in the treatment of patients. During 1969 it admitted 26,145 patients. By-Laws of the Medical Staff, St. Paul Hospital, define "Medical Staff" as "all of the physicians and dentists who are privileged to attend patients in St. Paul Hospital" (hereinafter staff). "House Staff" is defined therein as "the interns and residents who are employed by the Hospital." During 1969, nine staff radiologists practiced radiology and supervised the work of radiology residents at St. Paul Hospital. The staff radiologists billed each patient for professional services rendered. They received no compensation from St. Paul Hospital, regardless of whether services were rendered by the radiology residents or themselves. St. Paul Hospital did bill patients for technical radiographic services. During a three-year general radiology residency at St. Paul Hospital, a resident spends three months in nuclear medicine, eleven *195 months in radiation therapy, and the remainder of time in diagnosis. While in diagnosis, residents are rotated in pediatric radiology, neuro-radiology, and vascular radiology. The diagnostic division performed approximately 60,000 examinations during 1969. Petitioner's usual workday started about 7:30 or 8:00 a.m. and ended at 5:00 p.m. As a resident in radiation therapy, petitioner handled one or two new patients each day and up to twenty return patients whose therapy had been formulated. All decisions relating to therapy programs for new patients had to be approved by a staff radiologist. For return patients, petitioner was responsible for insuring that proper therapy was administered, but ultimate legal and professional responsibility remained with staff radiologists. Petitioner occasionally prescribed medicine for patients while rotating on radiation therapy. Radiology residents, as well as staff radiologists, were on call, i.e., available by telephone, for emergency duty at times established by St. Paul Hospital. Radiology residents were called first, but staff radiologists were called if the resident was unavailable or sought advice on a particular matter. St. Paul Hospital *196 paid petitioner $8,762.40 in 1969, from which it withheld $1,160.86 for Federal income taxes and $374.40 for F.I.C.A. employee taxes. Petitioner received $6,214.40 of that sum as an intern (January 1 through June 30, 1969) and resident (July 1 through December 31, 1969), and he received the remaining $2,548 for services rendered in the emergency room of the hospital, at a rate of $10 per hour. St. Paul Hospital also provided each resident with three cafeteria meals a day, laundry services for doctors' coats, paid malpractice insurance, and two weeks paid vacation. Petitioner's residency contract for July 1, 1969 through June 30, 1970, provided, in part, as follows: Said RESIDENT obligates himself to perform faithfully and properly all services ordinarily performed in such character of service and to which he may be assigned from time to time by the authorities of said hospital. Said Hospital binds itself to furnish said RESIDENT without charge board, laundry and uniforms and as further compensation to pay the sum of $6300.00 per year. * * * Said Hospital obligates itself not to discharge said RESIDENT during said period so long as he shall faithfully and properly *197 discharge his duties to the satisfaction of the hospital authorities, but otherwise reserves such right. Payments by St. Paul Hospital increased for each suceeding year of residency and were not determined on the basis of financial need. Petitioner did not publish any scientific research or scholarly articles as a result of his residency at St. Paul Hospital. St. Paul Hospital continued to pay petitioner during three months he spent in pediatric radiology at Children's Medical Center. Petitioner performed no duties for St. Paul Hospital during that time. The evidence does not show when this three-month tour occurred. Petitioner's 1969 Federal income tax return claimed under section 117 a monthly $300 fellowship grant exclusion for residency payments received from St. Paul Hospital. Since petitioner was a resident for six months in 1969, an exclusion of $1,800, i.e., 6 months times $300, was claimed. Petitioner testified that the staff radiologists "could easily have performed all the work without the services of any of the residents" and that "petitioner's activities included only professional services such as fluoroscopy and interpretation of films * * * those services accrued *198 benefits, namely money, only to the staff radiologist * * *." OPINION The issue is whether petitioner is entitled to exclude certain payments from his gross income as a fellowship grant under section 117. Section 117(a) (1) excludes from gross income any amount received as a scholarship or fellowship grant. For individuals who are not candidates for degrees, section 117(b) (2) (A) provides, in part, that the grantor of the fellowship grant must be one of several types of organizations, including an organization described in section 501(c)(3) which is exempt from tax under section 501(a). [2] Section 117(b) (2) (B) provides, in part, that the amount of fellowship grant excluded under subsection (a) (1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under that grant during such taxable year. Section 1.117-4(c), Income Tax Regs., provides, in part, that payments for past, present or future employment services or payments for services which are subject to the direction or supervision of the grantor *199 will not qualify for exemption under section 117. In Bingler v. Johnson,394 U.S. 741, 751 (1969), the Supreme Court of the United States upheld the validity of this regulation and noted its consistency with "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial quidproquo from the recipients." On the basis of the evidence in this record, we find that the payments in question constitute compensation for past, present or future services that were subject to the direction or supervision of the grantor. St. Paul Hospital is primarily engaged in the treatment of patients, a fact graphically supported by its admission of 26,145 patients during 1969 and the performance of approximately 60,000 diagnostic radiological examinations during 1969. Petitioner rendered substantial services to St. Paul Hospital. He examined one or two new patients and up to twenty return patients each day. He was responsible for insuring that proper therapy was administered to return patients, and he occasionally prescribed medicine for patients while serving on the radiation *200 therapy rotation. Although petitioner testified that the nine staff radiologists at St. Paul Hospital could easily have performed all radiological work without the services of any residents, it is clear that the radiology residents did in fact perform a great deal of those services. In addition to normal duties, petitioner was on call for emergency duty at times established by St. Paul Hospital. While on emergency duty, petitioner was called first for radiology services, and a staff radiologist was only called if petitioner was not availablee or consultation with a staff radiologist was necessary. Petitioner contends that payments he received of $10 per hour for additional service in the emergency room show that his acceptance of this residency was for the purpose of furthering his education, as the fair market value of his services was far in excess of the payments he was receiving. This Court considered such a contention in Aloysius J. Proskey,51 T.C. 918, 924, 925 (1969), as follows: Petitioner maintains, however, that his principal objective in accepting an appointment as a resident physician at great financial sacrifice was to obtain training in his profession--to *201 have the opportunity to consult with staff physicians on a variety of medical problems. There can be no serious doubt that work as a resident physician provides highly valuable training, particularly in preparing for specialties in the various fields of medicine. Yet virtually all work as an apprentice, whether in medicine or law, carpentry or masonry, provides valuable training. Nothing in section 117 requires that an amount paid as compensation for services rendered be treated as a nontaxable fellowship grant, merely because the recipient is learning a trade, business, or profession. Whatever training petitioner received during the years of his residency--and we do not deny that it was substantial--was merely "incidental to and for the purpose of facilitating the raison d'etre of the Hospital, namely, the care of its patients." * * * The element of severely reduced compensation is common to the many medical resident cases that have come before this Court, and, as in Proskey, it has not been persuasive. Furthermore, in this case payments by St. Paul Hospital to residents for services in the emergency room in addition to their regular services support an inference that the *202 hospital staff needed even more assistance than the medical residents provided in the course of their normal duties. There are other factors which support the conclusion that these payments constituted compensation. First, payments were based on length of service, not individual need. Sheldon A. E. Rosenthal,63 T.C. 454, 460; Geral W. Dietz,62 T.C. 578 (1974); Aloysius J. Proskey,supra. Second, petitioner received paid vacation leave, three hospital cafeteria meals a day, laundry services for doctors' coats, paid malpractice insurance, and other fringe benefits indicative of an employment relationship. Irwin S. Anderson,54 T.C. 1547, 1552 (1970). Third, St. Paul Hospital stated in its staff by-laws that residents are "employed" by the hospital and characterized the payments petitioner received as "compensation" for "services" he would perform for the hospital. Aloysius J. Proskey, supra at 924. Fourth, petitioner testified that staff radiologists "could" have performed all the "work" without the "services" of the residents and that his "services" accrued benefits to the staff radiologists.
*203 The purpose of the payments, therefore, was to provide compensation for past, present or future services rendered. Petitioner argues that billings were made only by staff radiologists, not by the hospital, and that therefore his services could not have been rendered in return for payments received from the hospital. This contention is not entirely true, however, because the hospital did bill each patient for technical radiographic services. Furthermore, that billings were made by staff radiologists and not by the hospital is irrelevant to the benefit received by the hospital's patients, and St. Paul Hospital was primarily engaged in the treatment of patients. The hospital thus enjoyed an adequate staff, at less labor cost than would be required by paying doctors who had completed their residencies, for treatment of its patients. As to the three months petitioner spent at Children's Medical Center, there is no evidence that St. Paul Hospital did not derive benefits from such an exchange program, either in the form of better training for its own residents or reciprocal visits from residents of Children's Medical Center. In the absence of a clear understanding of the relationship *204 between these two hospitals, we cannot attribute much weight to that exchange. Furthermore, petitioner produced no evidence as to whether this three-month tour occurred during 1969. Petitioner cites Pappas v. United States, an unreported case ( E.D.Ark. 1967, 19 AFTR 2d 1276, 67-1 USTC par. 9386), for support. In Pappas a jury found that a medical resident did receive a scholarship or fellowship grant under section 117. As indicated above, the facts herein do not support such a finding. Furthermore, no facts are given in the Pappas opinion and it is impossible to determine the facts of that case therefrom. We accordingly find Pappas distinguishable and unhelpful. We hold that petitioner is not entitled to exclude the payments in issue as a fellowship grant under section 117. Cf. Rundell v. Commissioner,455 F. 2d 639 (C.A. 5, 1972), affg. per curiam a Memorandum Opinion of this Court which reached a similar result for a surgical resident at St. Paul Hospital for 1968. Decision will be entered for the respondent.
Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as in effect during 1969.↩
2. Respondent does not dispute that St. Paul Hospital qualifies under section 117(b) (2) (A).↩