CHRISTINE CAROL ARTHUR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Arthur v. Commissioner
Docket No. 8185-76.
United States Tax Court
T.C. Memo 1978-396; 1978 Tax Ct. Memo LEXIS 121; 37 T.C.M. (CCH) 1647; T.C.M. (RIA) 78396; October 2, 1978, Filed *121 Held, monies received by petitioner as a result of her medical internship at Waterbury Hospital, Waterbury, Connecticut and residency at University of Oregon Medical School Hospitals and Clinics and Veterans Administration Hospital, Portland, Oregon are not excludable from income under sec. 117. Susan Elizabeth Reese, for the petitioner. Gary R. DeFrang, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent, on June 2, 1976, issued a statutory notice in which he determined deficiencies in petitioner's Federal income tax for her calendar years 1973 and 1974 in the amounts of $ 748 and $ 830.33, respectively. The sole issue for our determination is whether amounts received by petitioner as an intern and as a resident are excludable from her *122 gross income under section 117, I.R.C. 1954. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner, Christine Carol Arthur, resided in Portland, Oregon at the time her petition was filed with the Court. Her Federal income tax returns for her taxable years 1973 and 1974, prepared on the cash receipts and disbursements method of accounting, were filed with the internal revenue service center, Ogden, Utah. Petitioner is a physician specializing in the field of psychiatry. She received her medical degree from Cambridge University, Cambridge, England in 1972. At that time petitioner was qualified to practice medicine in England. However, in order for petitioner to qualify for a license to practice medicine in the United States it was necessary for her to complete a 1-year medical internship or the first year of a medical residency. Therefore, on December 28, 1970 petitioner applied to Yale University Medical School for an internship. She received an appointment and served her internship at Waterbury *123 Hospital, Waterbury, Connecticut from June 28, 1972 to June 27, 1973. Waterbury Hospital is a 500-bed community hospital affiliated with Yale University Medical School. It serves a population in excess of 215,000 and admits approximately 19,000 patients each year. The emergency room treats approximately 45,000 patients each year. It incorporates an outpatient clinic and many specialized units within the hospital. On May 12, 1972 petitioner entered into a written agreement with Waterbury Hospital setting forth the terms and conditions of her internship. Under the provisions of the agreement petitioner was to receive a salary of $ 7,920 per year plus a $ 90 per month meal allowance and an apartment on hospital grounds. The agreement also provided for 2 weeks of vacation per year.The hospital provided both malpractice insurance and medical and hospitalization insurance. Under the agreement petitioner was appointed to a rotating internship. Her hours of duty were to be approximately 7:00 a.m. to 5:00 p.m. daily plus night and weekend call every other or every third night.The duration of her assignments was to be 6 months of internal medicine, 4 months of surgery and 2 months *124 of pediatrics. The hospital agreed to provide a suitable environment for a medical educational experience while petitioner agreed to provide the customary services of intership and not to engage in outside remunerative work. The interns at Waterbury Hospital were directly involved with patient care. The patients were assigned to interns by either the attending physician or a chief resident who gave the intern no discretion to refuse care of such patients. The interns were under the supervision of the hospital staff and chief residents. They did not have complete patient care authority. During night duty a staff person was on call. While an intern petitioner delivered babies, assisted at surgery, treated emergency patients, gave physical exams, prescribed and provided treatment and consulted with attending physicians. She worked approximately 90 hours per week. During 1973 she received payments totaling $ 4,274.09 as a result of her internship at Waterbury Hospital. Federal income taxes were withheld from these payments. Upon completion of her intership petitioner received a certificate enabling her to apply for unrestricted state licensure. At this point in her career *125 petitioner decided to pursue training in psychiatry. On December 6, 1972 petitioner was appointed to the psychiatry residency program at the University of Oregon Medical School (hereinafter Medical School) for the 3-year period beginning July 15, 1973. The primary purpose of the residency programs of the Medical School is to provide the training necessary for certification in a variety of medical specialities. The Medical School, founded in 1887, is a state institution for the training of medical personnel. It is located in Portland, Oregon. Residents are assigned to one or more of its hospitals and clinics or to other medical facilities. Ore. Rev. Stat. section 352.055 (1973) provides in part: Functions of Medical School. (1) The University of Oregon Medical School shall provide clinical facilities for the education of students, shall maintain relationships with other hospitals in Oregon for the clinical training in health sciences, and shall provide clinical services to patients and shall support research activities to the extent reasonably necessary for support of the teaching function. (2) In all matters affecting the activity of the University of Oregon Medical *126 School, the education function shall be the primary factor for consideration. As a necessary adjunct to its educational purpose, it must provide medical service. Those persons admitted for care shall be selected because treatment of their illness or condition contributes a valuable learning experience for students in training. The Medical School hospitals and clinics are operated by the Oregon State Board of Higher Education. They consist of two hospital units, an outpatient clinic, an emergency service and crippled children's unit. All members of the permanent medical staff of the hospitals and clinics are members of the faculty of the Medical School.Responsibility for their operation lies with the Dean of the Medical School. The principal sources of funds for the operation of the hospital and clinics are appropriations by the State of Oregon and payments by patients for services rendered.
Petitioner was a resident in the psychiatric residency program from July 15, 1973 to July 15, 1976. She served her residency at both the Medical School hospitals and clinics and the Veterans Administration Hospital. During 1973 and 1974 approximately 50 interns and 280 residents were *127 assigned to the Medical School hospitals and clinics. Residents appointed by the Medical School received a stipend computed on a monthly basis. The Medical School also supplied meals, malpractice insurance, health coverage and paid vacations. Financial need was not considered in determining to whom a residency would be awarded. Payments received by petitioner during 1973 and 1974 as a result of her Medical School residency were as follows: 1973
University of Oregon Medical
School Hospitals and Clinics
$ 3,044.74
Veterans Administration Hospital
1,157.48
Total
$ 4,202.22
1974
Veterans Administration
$ 5,726.48
University of Oregon Medical
School Hospitals and Clinics
5,157.26
Total
$ 10,883.74 State and Federal income taxes were withheld from all payments which petitioner received during 1973 and 1974 as a result of her residency. During 1973 and 1974 the Medical School employed approximately 225 medical doctors excluding medical interns and residents. Some of these doctors were assigned to the hospitals and clinics on a full or part-time basis. The psychiatric care facilities had the equivalent of approximately 10 permanent medical staff members *128 involved with the teaching programs. In addition, there were approximately 18 psychiatric residents in various stages of a 3-year residency program. Some of the residents were assigned to facilities other than the hospitals and clinics.At the hospitals and clinics they had, in approximate numbers, 3,000 emergency visits and 5,000 outpatient visits plus 1,000 admissions to the hospital units and 400 consultations per year. Residents of the Medical School are supervised by the permanent staff and by senior residents. Residents at the hospitals and clinics supervise residents junior to them, interns and medical students. During 1973 and 1974 petitioner had emergency room duty at night and on weekends plus 1 day in 5. She worked an average of 56 hours per week. The reduction of hours in the psychiatry program was due to the stress of that field and the belief that counseling, therapy and evaluation of a psychotic or disturbed patient required the utmost attention on behalf of the doctor. Residents were required to read professional materials in their off duty time. As a resident, patients were assigned to petitioner. She was given the discretion of placing the patient under *129 inpatient or outpatient treatment. Her responsibilities to these patients included interviewing, giving physical and mental status examinations to diagnose illness and prescribing treatment. Treatment was the result of joint decisions by the resident and the chief resident or attending physician.Petitioner also served as a case manager on several occasions.The case manager was responsible for the coordination of patient treatment. On her income tax return for each of her taxable years 1973 and 1974 petitioner claimed a $ 3,600 exclusion for fellowship or grant under section 117. Respondent disallowed this exclusion. Petitioner did not claim deductions for employee business expenses or for moving expenses on her 1973 income tax return. Respondent agrees that, if we find for him on the section 117 issue, petitioner is entitled to an employee business expense deduction of $ 47 and a moving expense deduction of $ 820 for that taxable year. OPINION This case is another of the apparently endless series of cases wherein a medical intern or resident attempts to exclude his salary under section 117 as a receipt of a scholarship or grant. *130 Section 117 provides that amounts received as a scholarship or fellowship grant are excludable from gross income. A precondition to the applicability of section 117 is a determination that the payments in issue are encompassed by the terms "scholarship" or "fellowship grant." Reese v. Commissioner, 45 T.C. 407, 413 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). While the Code does not furnish a definition for these terms the Income Tax Regs. define them in a manner that comports with their ordinary usage. [1]Bingler v. Johnson, 394 U.S. 741, 751 (1969). These regulations provide that scholarships and fellowship grants are stipends that have no "strings" or requirements of a quid pro quo. *131 The test used to distinguish a grant from compensation is whether the payments were made primarily for the purpose of education, training or research or as compensation for services rendered. Proskey v. Commissioner,51 T.C. 918, 923 (1969). In applying this test a distinction must be made between the primary purpose for the existence of the institution and the intern or residency program and the primary purpose for the payments. Thus, the fact that under Oregon law the educational aspects of the Medical School were the primary reason for its existence or that both the Medical School and the Waterbury Hospital programs were designed to provide an educational experience for the residents and interns which would comply with the standards of the Essentials of an Approved Internship, as prepared by the Counsel on Medical Education of the American Medical Association is not determinative of the issue at hand. Hembree v. United States,464 F.2d 1262, 1264 (4th Cir. 1972). Petitioner provided substantial services beneficial to the hospital. Rosenthal v. Commissioner,63 T.C. 454, 460 (1975). *132 This fact distinguishes this case from Bieberdorf v. Commissioner,60 T.C. 114 (1973) and Bailey v. Commissioner,60 T.C. 447 (1973). In Bieberdorf the taxpayer was in an academic medicine program in which the main stress was research. He spent 75 to 80 percent of his time engaged in research. Although he spent the remainder of his time "helping out" in the clinic he was not a resident physician in the hospital, he was not required to keep regular hours, he was not on call, and he was not responsible for the care of patients. In Bailey the taxpayer was in a cardiorenal training program where he received training in research and laboratory techniques and in basic science. The facts therein indicated that these training activities provided no benefit to the progenitor of the program. Petitioner's attempt to align herself with Bieberdorf and Bailey is futile. Her factual circumstances are indistinguishable from those in Weinberg v. Commissioner,64 T.C. 771 (1975) and Fisher v. Commissioner,56 T.C. 1201 (1971). In Weinberg the taxpayer was an intern and resident on a rotating program while *133 in Fisher the taxpayer was a resident in psychiatry. Both were found to have performed extensive and valuable services by examining and interviewing patients, participating in the evaluation and treatment of the patients and being on call. Herein petitioner engaged in all the above activities. She was, at both Waterbury Hospital and the Medical School, assigned specific duties and hours for which she was responsible to ensure coverage of patient care. Her stipends were not based on need. The fact that direct or indirect supervision existed ensured work at a standard beneficial to the hospitals and clinics. Fisher v. Commissioner,supra at 1212. In addition, the possibility that the non-resident and non-intern staff could operate the facilities without the aid of the residents and interns is not determinative of the issue. As in Fisher the extensive services performed by interns and residents at the facilities indicate that the effectiveness of the institutions would be enervated by the elimination of residents and interns from their staffs. Petitioner cites Wrobleski v. Bingler,161 F.Supp. 901 (D.C. W.D. Pa. 1958) as supportive *134 of her case. Not only is that case not precedential herein, but it is factually distinguishable because the trier of fact therein found that the services performed by the taxpayer were not of primary or material benefit to the institution. To the contrary we find that petitioner performed valuable services for the institutions which paid the stipends. We find further that the primary purpose behind the payment was the receipt of such services. Therefore, the payment represents compensation for services and is not excludable under section 117 as a scholarship or fellowship grant. Respondent having made certain concessions in the event that we hold such amounts includable in gross income Decision will be entered under Rule 155. Footnotes
1. Sec. 1.117-3(a). Scholarship. A scholarship generally means an amount paid or allowed to, or for the benefit of, a student, whether an undergraduate or a graduate, to aid such individual in pursuing his studies. The term includes the value of contributed services and accommodations * * * and the amount of tuition, matriculation, and other fees which are furnished or remitted to a student to aid him in pursuing his studies. The term also includes any amount received in the nature of a family allowance as a part of a scholarship. * * *
(c) Fellowship grant. A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research. The term includes the value of contributed services and accommodations * * * and the amount of tuition, matriculation, and other fees which are furnished or remitted to an individual to aid him in the pursuit of study or research. The term also includes any amount received in the nature of a family allowance as a part of a fellowship grant. * * * Sec. 1.117-4. The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117: * * *
(c) Amounts paid as compensation for services or primarily for the benefit of the grantor.(1) * * * any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor. However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph↩. [Emphasis supplied.]