MARK TURNER HANSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hanson v. Commissioner
Docket No. 3348-77.
United States Tax Court
T.C. Memo 1979-108; 1979 Tax Ct. Memo LEXIS 419; 38 T.C.M. (CCH) 504; T.C.M. (RIA) 79108; March 26, 1979, Filed *419 Petitioner is a physician/resident. Held, petitioner not entitled to an exclusion from income under sec. 117 for any amounts during the years in issue. Mark Turner Hanson, pro se. Wayne R. Appleman, for the respondent. STERRETT *420 MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined deficiencies in petitioner's income taxes paid for his taxable years ended December 31, 1973, 1974 and 1975 in the respective amounts of $127.00, $1,056.40 and $802.00. The only issue before the Court is whether petitioner is entitled to an exclusion from income under section 117, I.R.C. 1954, for any of his taxable years in issue. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner, Mark Turner Hanson, filed his income tax returns for the years in issue with the western service center, Ogden, Utah. At the time he filed his petition herein, petitioner resided in Edmonds, Washington. Petitioner uses the calendar year as his tax accounting period and is on a cash basis of accounting. For his taxable year 1973 petitioner excluded $1,800 from *421 income under the asserted authority of section 117. He excluded $3,600 from income during each of his taxable years 1974 and 1975 on the same grounds. Respondent mailed his notice of deficiency to petitioner on December 27, 1976. Petitioner is a physician. He graduated from medical school in June of 1973 and entered The Doctors Hospital Family Practice Residency Program (program) on June 25, 1973. The program is an American Medical Association approved residency program designed to help its residents qualify for certification by the American Board of Family Practice. The program is centered at The Doctors Hospital in Seattle, Washington (Hospital) and is affiliated with the University of Washington School of Medicine. The Hospital has 166 beds and over 100 private physicians encompassing most specialty areas. Residents in the program work not only at The Doctors Hospital but also may be assigned to, or may elect to work at, the Children's Orthopedic Hospital and Medical Center, the Group Health Cooperative, the University Hospital, the Vashon Island Clinic, the Harborview Medical Center, and the Public Health Service. Wherever the resident is working his salary is paid *422 by The Doctors Hospital. While in the program petitioner signed three 1-year contracts with The Doctors Hospital. The first contract ran from June 25, 1973 to June 24, 1974 and provided for an annual "salary" to petitioner of $8,400. In addition, meals were supplied while petitioner was on duty; uniforms were supplied and laundered by the hospital; and major medical insurance for the resident and his family (if any) and life insurance for the resident were supplied. Petitioner was entitled to 2 weeks vacation per year with pay. Petitioner's second year contract ran from June 25, 1974 to June 24, 1975 and was identical to the first year contract except that it provided for an annual "salary" of $12,000. In petitioner's third year as a resident he signed a more elaborate contract in which he agreed to "fulfill the educational requirements of the Residency Program * * * and to accept and comply with obligations and responsibilities as outlined in Manual." In return the Hospital promised "to provide an educational program and atmosphere and to maintain its staff and its facilities in compliance with all the standards of the American Medical Association 'Essentials of Approved *423 Residencies.'" No restrictions were put on petitioner's off duty activities so long as these activities did not interfere with his obligations to the Hospital as defined in The Doctors Hospital Family Practice Residents Manual (manual). Under this contract petitioner received an annual "stipend" of $15,000, 15 "working days" annual leave, medical and term life insurance and coverage under the medical malpractice group insurance policy carried by the Hospital. He also still received meals while on duty, laundry, and uniforms. The Hospital withheld Federal income and FICA taxes from petitioner's wages during all the years in issue. Any resident not complying with the program's requirements as described in the manual could be terminated by the Hospital, subject to compliance with a grievance procedure. Petitioner's pay was subject to reduction for unexcused absences from work and he could be dismissed from the program for repeated absences. Annual salaries were not based on need, but were based solely on the resident's post-doctoral year. All residents in the same program year were paid identical salaries except for the chief resident and assistant chief resident who received *424 additional payments of $100 and $50 monthly, respectively, because of their added responsibilities. A brochure included in the record describes the duties and obligations undertaken by all the program's residents. During the program's first year, for example: There are four sessions on medicine, three sessions on obstetrics, three sessions on surgery and one session devoted to emergency medicine. Eight weeks are spent at Children's Orthopedic Hospital for inpatient pediatrics. After an orientation to ambulatory care, [first year residents] spend one-half day per week throughout the year in the family practice clinic. Night call is shared equitably among the [first year residents] each of whom works no oftener than every third night. Salary is $ per year plus benefits, including health and life insurance, four uniforms, parking and meals while on duty and two weeks vacation. [sic] In the resident's third year he: [Is] primarily clinic based. [Third year residents] care for over one hundred and fifty families during five half-day office sessions. The skills of maintaining health, preventing disability and educating patients are learned. Hospital responsibilities *425 center around caring for one's own admissions. A rural practice experience for all [third year residents] on nearby Vashon Island is integrated into the final year. * * **t Night call is in the Emergency Department and salary is $15,000 per year. The added benefit of a subsidized Family Practice Review course is provided. While, as the above quotes indicate, the residents' work in a variety of areas while in the program, work in the "clinic" is emphasized. The "clinic" is the Community Family Practice Clinic (Clinic). The Clinic is a model unit, wholly owned by the Hospital, where each resident "[learns] by building his own 'private practice'". [2] During the first year of residency the resident spends one-half day per week at the Clinic. There he "assumes primary care responsibility for an ever-increasing patient population, dealing with * * * six to eight [patients per day] by the end of the year." The resident must consult with other physicians at the Clinic "when necessary". In the majority of cases residents give initial treatment to Clinic patients without the presence of an attending faculty member. Under supervision first-year residents deliver babies *426 and perform surgery. When a resident's Clinic patients are in the Hospital, he "[follows] them as their personal physician, in addition to carrying out the duties of his particular in-hospital rotation." First year residents also make house calls. Once a week a first-year resident's charts are reviewed by a third-year resident.
Third-year residents spend four one-half day shifts in the Clinic. They work with less supervision and have their own "fairly stable practice." In the company of a faculty member they visit nursing home patients. They teach first or second-year residents, review charts of first-year residents, and in general work as part of a team "delivering quality health care." All residents also have fixed call schedules at the Hospital. First-year residents are on call approximately every third night while second and third-year residents are on call approximately every fifth night. If a resident must leave the Hospital during these working *427 hours, he must be certain his assignment is covered by another physician and that his alternate is conversant with any patients which may require special care. While on duty at the Hospital the resident provides patients with continuous and comprehensive care. If a patient has a problem, the resident examines the patient and makes findings as to possible therapy or treatment. The resident will then call the patient's physician and discuss his conclusions with the physician. Depending on the seriousness of the problem, the physician might or might not come in at that time. By the resident's third year his conclusions with respect to treatment are very often accepted by the patient's own doctor. Funds collected from fees generated by the Clinic, including those attributable to services performed by residents, are treated as part of the operating revenues of the Clinic and the program. Residents in the program attend lectures, meetings, hold conferences, and are encouraged to produce papers. Petitioner was subject to all the above described duties and obligations during his tenure in the program. He was not, during the years in issue, a candidate for a degree within the meaning *428 of section 117. OPINION The sole issue before us is whether petitioner may exclude certain amounts from income for the years in issue under section 117. [3] Petitioner argues that the amounts he excluded were received by him as scholarship or fellowship grants. He argues that the payments received were "no-strings attached" stipends paid to him for the primary purpose of enabling him to pursue his studies of family medicine and not as compensation for past, present or future services. He has written excellent briefs and we compliment him. Respondent claims that petitioner's receipts were in consideration of present or future services and are therefore includible in his income. We hold for respondent. *429 We believe that petitioner's receipts qualify as neither a scholarship nor fellowship grant. To be a "scholarship" the amounts must be received at an educational institution as defined in section 151(e)(4). In section 151(e)(4) the term "educational institution" is defined as being "only an educational institution which normally maintains a regular faculty and curriculum and normally has a regularly organized body of students in attendance at the place where its educational activities are carried on." Section 151(e)(4), section 1.117-3(b), Income Tax Regs. It would not appear that any of the hospitals or clinics in which petitioner worked while a resident in the program qualify as such an institution. Indeed, the evidence affirmatively shows these institutions to be working hospitals and clinics whose primary purpose was to heal and care for the sick--not educate students. We have found that petitioner was not a candidate for any degree while he was a resident. While it may be true that each resident received some amount of didactic instruction and was required *430 to attend certain conferences, this instruction and these conferences cannot render a hospital into something it is not, namely an "educational institution." Thus we must move to the question whether the amounts paid to petitioner were paid as "fellowship grants". The term "fellowship grant" is defined in the regulations as "an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." Section 1.117-3(c), Income Tax Regs. However, no amount paid to an individual is included in the term "fellowship grant" if such amount constitutes "compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor." Section 1.117-4(c)(1), Income Tax Regs. Further, a fellowship grant" does not include "[any] amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor." Section 1.117-4(c)(2), Income Tax Regs. *431 Amounts paid to an individual to enable him to pursue studies or research are included in a "fellowship grant * * * if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity'" Section 1.117-4(c)(2), Income Tax Regs.
Thus the regulations make clear the distinction that no payments which are not primarily for the benefit of the recipient, aimed at furthering his individual training, can qualify as a fellowship grant. The Supreme Court upheld the validity of these regulations in the case of Bingler v. Johnson,394 U.S. 741, 751 (1969). In that case the Supreme Court bypassed the primary purpose language of the regulations and addressed itself to the fact that "the definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of * * * 'fellowships' as relatively disinterested, 'no strings' educational grants, with no requirement of any substantial quid pro quo from the recipients." Bingler v. Johnson,supra at 751. *432 If there is a substantial quid pro quo the payments cannot qualify for exclusion from income as fellowship grants. Hembree v. United States,464 F.2d 1262, 1265 (4th Cir. 1972). In determining whether there are any strings attached to the payments received by petitioner, "we must look to the nature of the services petitioner was required or might have been required to perform." [Emphasis added.] Dietz v. Commissioner,62 T.C. 578, 585 (1974). The examination takes place at the payor's level without regard to the motives or goals of the individual accepting the payment. It is clear from all the facts that petitioner was required to perform substantial services in return for the salary paid him. He performed many valuable services for the Hospital, including his services at the Clinic and while on call. His responsibilities at the Clinic, some of which are described above, are only examples of those to which petitioner was subject. Petitioner, either alone or under generalized supervision of program faculty members, made diagnoses, was on call, helped in surgery, and delivered babies. He was, in fact, given entire families as his patients *433 at the Clinic. He was responsible for these persons just as if he were in private practice. While no one was billed separately for his services, receipts of the Clinic, including those attributable to petitioner's services, were used by the program to cover its expenses, including petitioner's salary. Petitioner was paid based on length of service, not financial need. This has been considered an indicium of compensation. Proskey v. Commissioner,51 T.C. 918, 924 (1969). Federal income and FICA taxes were withheld from his income, petitioner got paid vacations, sick leave, malpractice insurance and other fringe benefits indicating his employee status. See Rosenthal v. Commissioner,63 T.C. 454, 460 (1975); Adams v. Commissioner, 71 T.C. (Dec. 28, 1978). Since petitioner's receipts were compensation for services and were not "no-strings attached" educational grants, we must hold for respondent. Decision will be entered for the Respondent.
Footnotes
1. Petitioner has conceded the correctness of respondent's adjustments for self-employment tax in the amount of $184.15 for his taxable year ended December 31, 1974.↩
2. This and many of the following quotes are taken from the manual as it stood in 1975. The manual was amended from time to time but the quoted sections are representative of petitioner's duties throughout his residency.↩
3. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS (a) General Rule.--In the case of an individual, gross income does not include-- (1) any amount received-- (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or (B) as a fellowship grant, * * *
(b) Limitations.-- * * *
(2) Individuals who are not Candidates for Degrees.-- In the case of an individual who is not a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall apply only if the condition in subparagraph (A) is satisfied and then only within the limitations provided in subparagraph (B). (A) Conditions for Exclusion.--The grantor of the scholarship or fellowship grant is-- (i) an organization described in section 501(c)(3) which is exempt from tax under section 501(a), * * *
(B) Extent of Exclusion.--The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year * * *.↩