Gaylan L. and Mary H. ROCKSWOLD,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Thomas A. and Susan E. CHRISTIAN-
SEN, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Melvin A. and Rebecca L. YARLOTT,
Jr., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Nos. Civ. 3–77–305, 3–77–306, 3–77–321.

United States District Court,
D. Minnesota,
Division 3.

June 27, 1979.

Ronald Patrick Smith, St. Paul, Minn., for plaintiffs.

Max H. Lauten, Dept. of Justice, Washington, D.C., for government.

DEVITT, Chief Judge.

In these cases, consolidated for trial, plaintiffs seek a refund of taxes paid on "stipends" they received while medical fellows and candidates for advanced medical degrees at the University of Minnesota. Plaintiffs claim the stipends qualify as scholarships under § 117 of the Internal Revenue Code, and thus are excludable from gross income. The government is of a contrary view, maintaining the stipends are taxable income because they represent compensation for services rendered. The case was tried to the court from April 2–5, 1979. For the reasons stated below, this court holds that the stipends are not excludable from gross income under § 117 of the Code.

## FACTS

Plaintiffs, Thomas Christiansen, Gaylan Rockswold, and Melvin Yarlott, were candidates for advanced degrees in otolaryngology, neurosurgery, and surgery, respectively, at the University of Minnesota during the tax years in question.[1] The University's advanced medical degree program is similar in many respects to residency programs for recent medical school graduates. The typical residency program, however, does not lead to an advanced degree, while of course the advanced medical degree program does. Both residents and advanced degree candidates ("medical fellows") receive stipends in the general range of $10,000 per year, which increase with experience. Both also spend a considerable amount of time working in hospitals, receiving what might be called a clinical education. Generally, these hospitals pay part or all of their residents' and fellows' stipends, and the parties are in agreement that for residents those stipends constitute taxable income. The primary distinction between residents and medical fellows is that the latter, in addition to their clinical duties, also are required to spend a considerable amount of time performing pure medical research to prepare themselves for careers in academic medicine or medical research. This distinction, plaintiffs claim, differentiates medical fellows from ordinary residents and causes their stipends to be true scholarships under § 117.

During the clinical phase of the advance degree program, the medical fellows are rotated between the University of Minnesota Hospital and several affiliated hospitals within the Twin Cities area, including the Minneapolis Veterans Administration Hospitals. The specific day-to-day duties of a medical fellow during the clinical phase vary depending upon his area of medical specialty, the hospital to which he is assigned at that time, and the condition, type, and number of patients needing treatment. Medical fellows, like residents, often spend more than twelve hours per day working at the hospital, and are on call several nights each week as well as many weekends and holidays. They generally participate in making daily rounds, usually with a team that includes a staff physician, a resident, and one or two medical students. The team normally discusses the medical condition of each patient and makes recommendations for tests and treatment. Occasionally the staff physician will not be present during these rounds, in which event the medical fellow will assume his responsibilities.

Other tasks performed by medical fellows during the clinical phase include ordering prescriptions; writing treatment orders for patient care; taking patients' physical and medical histories; ordering special reports, including consultations, X-rays, and clinical laboratory analysis; assessing and diagnosing patients; reviewing intern or medical student diagnosis; securing autopsy consents; preparing progress notes, case summaries, and discharge notes; commencing

---

1. Dr. Christiansen is seeking refunds of $1,871 16 and $2,161.63 for the years 1971 and 1972; Dr. Rockswold is seeking refunds of $2,197.35 and $1,824.50 for the years 1973 and 1974; and Dr. Yarlott is seeking $3,137.54 for the year 1972. While these gentlemen are the named plaintiffs in this action, their attorneys' fees, costs, and other expenses are being paid by the University of Minnesota.

the administration of intravenous fluids; inserting nasal gastric tubes; scheduling operating room appointments; preparing patients for operations; preparing operating notes; changing dressings; removing sutures; and working in the emergency room. Furthermore, medical fellows normally assist in or perform several hundred operations during their years of clinical training. These operations are generally carried out by fellows in the presence and under the direction and control of a staff or treating physician. Occasionally, however, operations are performed without a physician present.

During the final year of the advance degree program, medical fellows are required to act as chief residents at either the University Hospital or one of the affiliated hospitals. In this position, they are on call 24 hours a day and are required to assume extensive supervisory and administrative responsibilities, including running their own services, organizing the teaching of medical students and interns, and scheduling and supervising the other residents and medical fellows.

Plaintiffs strenuously argue, and have presented supporting testimony, that the tasks they perform during their clinical training is of no more than minimal value to the hospitals. They assert that the training is entirely for their educational benefit, and that the participating hospitals would function just as effectively, and with no additional expense, if medical fellows were not assigned to the hospitals. The court cannot accept this factual assertion. It seems clear from the evidence and from common sense that the services performed by medical fellows during the clinical stage directly benefit the hospitals, staff physicians, and patients. It stretches the imagination too far to accept the view that the myriad services and 12 hour days performed by the medical fellows could readily be eliminated without an adverse effect on the hospitals and on patient care. Clearly, at a minimum, staff and treating physicians

would have to put in longer hours and be on call more often during undesirable hours if the hospitals did not have the benefit of the medical fellows' services. Therefore, the court finds that the participating hospitals do benefit directly from their use and employment of medical fellows.

Besides the clinical phase, medical fellows also are required to participate in a research phase. This phase distinguishes them from typical residents, and its purpose is to prepare the fellows for teaching and research careers. Each fellow must perform at least one major original research project, which normally culminates in a published article in a recognized medical journal. The research project often takes several years to complete. The medical fellows are allowed to choose areas of research based upon their interests and medical needs, and neither the University nor any hospital or faculty member dictates the parameters within which an area of research is required to be selected. Some fellows spend their full time doing research during this phase of the program, while others divide their time between clinical and research duties.

The medical fellows receive stipends during the entire time they are in the advanced degree program, regardless of whether they are performing clinical or research functions, or both, at the time. The stipends are awarded by the medical school, and, with few exceptions, all applicants accepted into the program receive stipends. The amount of the stipend is determined by a committee of department heads at the University, and that amount usually approximates the amount paid to medical residents throughout the Midwest. The decision to award a stipend is not based on need, and the amount increases as a fellow progresses through the program.

The sources for the stipends primarily are the hospitals that participate in the advanced degree program, although monies also are received from state and federal grants and charitable contributions. The

hospitals that utilize the services of medical fellows enter into affiliation agreements with the University, whereby each hospital agrees to fund a specific number of stipends. The amount each hospital pays is based on the number of fellows assigned to that hospital. Normally, the University bills the hospital for that amount, places the funds in a pool, then distributes the stipends to the fellows. Therefore, it is not possible to ascertain specifically the source of the stipend for any individual fellow. The Veterans Hospital, however, makes payments directly to the medical fellows that it funds and withholds income taxes from those payments. These particular fellows may or may not be assigned to the Veterans Hospital, depending apparently upon their medical specialties, but if they are not, then fellows receiving stipends from other sources are assigned there. Thus, as can best be determined from the evidence presented, each affiliated hospital pays the stipends for as many medical fellows as are assigned to that hospital in the given year. Furthermore, the hospitals provide malpractice insurance for their fellows, except at the Veterans Hospital where fellows are covered by the Federal Tort Claims Act, and they also provide lab coats, laundry services for uniforms, free meals while on call, and finally, two weeks paid vacation each year.

## DISCUSSION

*Background*

Plaintiffs claim the stipends they received were scholarships or fellowships within the meaning of § 117 of the Internal Revenue Code, and thus were excludable from their gross incomes. Section 117(a) provides for exclusion from gross income of any amount received as a scholarship or fellowship grant. This general exclusion is limited with respect to degree candidates by § 117(b)(1), which states that amounts received as payment for services are not excludable from gross income unless those

services are required of all candidates for that particular degree.

Although the Code provisions summarized above seem clear and easily comprehensible, § 117 has never been mechanically applied by either the courts or the Internal Revenue Service. In the leading case of *Reese v. Commissioner*, 45 T.C. 407 (1966), *aff'd per curiam*, 373 F.2d 742 (4th Cir. 1967), for example, the Tax Court held that, before the exclusionary provisions of § 117 even become operative, a taxpayer must first establish "that the payment sought to be excluded has the normal characteristics associated with the term 'scholarship'." *Accord, e. g., Parr v. United States*, 469 F.2d 1156, 1159 (5th Cir. 1972); *Hembree v. United States*, 464 F.2d 1262, 1265 (4th Cir. 1972); *Quast v. United States*, 428 F.2d 750, 751 (8th Cir. 1970).

The principles espoused in *Reese* are also evident in the Treasury Regulations promulgated under § 117. The most significant regulation in relation to this case is Treas. Reg. § 1.117–4, which provides in pertinent part:

§ 1.117–4 *Items not considered as scholarships or fellowship grants.*

The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:

.  .  .  .  .

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.*

(1) . . . any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor.

However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant.

Prior to 1969, the courts in construing § 117 and the regulations often came to diverse and unpredictable results. Based primarily upon the language of Treas. Reg. § 1.117–4, quoted above, the courts developed three distinct tests for determining when an alleged scholarship constituted taxable payment for services rendered. One, the primary purpose test, keyed upon whether the primary purpose of the scholarship was to benefit the grantor. *See, e. g., Peiss v. Commissioner*, 40 T.C. 78 (1963). Another, the employment or compensation test, looked to the existence of an employer-employee relationship and to whether the money received by the student represented compensation for services rendered to the grantor. *See, e. g., Wrobleski v. Bingler*, 161 F.Supp. 901 (D.Pa.1958). Finally, the control test emphasized the amount of supervision and control exercised by the grantor over the grantee of the scholarship funds. *See, e. g., Bonn v. Commissioner*, 34 T.C. 64 (1960).

The Supreme Court in 1969 for the first time interpreted § 117 and ruled on the validity of the regulations promulgated thereunder. *See Bingler v. Johnson*, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969). In *Bingler*, three Westinghouse employees received "stipends" from Westinghouse to assist them in pursuing doctoral degrees. Each was granted a leave of absence and each received a stipend based on his prior salary. Each also continued to receive employee benefits, including insurance, stock options, and retention of seniority status. The taxpayers were required to do dissertation projects that related to company interests, and periodic reports on their progress had to be submitted to Westinghouse. Finally, each taxpayer was required to return to Westinghouse following completion of graduate studies.

In concluding that the stipends were taxable income, the Court validated the Treasury Regulations promulgated under § 117 and applied an analysis that incorporated aspects of each of the three judicial tests that had developed to that date. Thus, the Court discussed the presence of an apparent continued employer-employee relationship, noting the close relation between prior salaries and the amount of the stipend, as well as the continued receipt of employee benefits by the taxpayers. Further, the Court discussed the control Westinghouse had over the taxpayers, including the fact that periodic work reports were required to be submitted.

The most important factor to the Supreme Court, however, was that Westinghouse extracted a *quid pro quo* for its grants. Noting that the dissertation topics of the taxpayers were required to be at least generally related to company interests, and that the taxpayers were required to return to work after the completion of their degrees, the Court concluded that:

> bargained-for payments, given only as a quo in return for the quid of services rendered—whether past, present, or future—should not be excludable from income as "scholarship" funds.

*Id.* at 757–758, 89 S.Ct. at 1448–1449.

The *quid pro quo* test, to some extent, manifests qualities of all the three previous tests under § 117; there are elements of the primary purpose, control, and employment

tests incorporated in it. However, it is clear that, since *Bingler*, the primary emphasis in the cases dealing with § 117 has been to determine whether claimed scholarships are actually given in return for the services of a grantee. Any funds so given are outside the § 117 exclusion from income.

*Similar Cases*

A great number of cases under § 117 have involved medical residents and interns. Graduate M.D.s are often required to engage in several years of clinical experience as a prerequisite to becoming fully certified physicians. This often involves, as is true in the present case, long hours of work at relatively low pay in medical training hospitals. Consequently, these medical professionals have sought, through hundreds of litigated cases, the exclusionary benefits of § 117, arguing that the work they do for the hospitals is an educational rather than an occupational pursuit. The vast majority of these decisions, however, have gone against the physicians, holding that the monies they receive while working for the hospitals are compensation for services and fully taxable. *See, e. g., Birnbaum v. Commissioner*, 474 F.2d 1339 (3rd Cir. 1973); *Parr v. United States*, 469 F.2d 1156 (5th Cir. 1972); *Hembree v. United States*, 464 F.2d 1262 (4th Cir. 1972); *Rundell v. Commissioner*, 455 F.2d 639 (5th Cir. 1972); *Wertzberger v. United States*, 441 F.2d 1166 (8th Cir. 1971), *aff'g* 315 F.Supp. 34 (D.Mo.1970); *Quast v. United States*, 428 F.2d 750 (8th Cir. 1970), *aff'g* 293 F.Supp. 56 (D.Minn.1968); *Cooney v. United States*, 78–2 U.S.T.C. ¶ 9513 (D.Ohio 1978); *Tobin v. United States*, 323 F.Supp. 239 (S.D.Tex. 1971); *Coggins v. United States*, 70–2 U.S. T.C. ¶ 9687 (N.D.Tex.1970); *Rosenthal v. Commissioner*, 63 T.C. 454 (1975). See also Rev. Rul. 57–386, 1957–2 C.B. 107; Rev. Rul. 68–520, 1968–2 C.B. 58.

The reasoning of these cases, simply stated, is that interns and residents are normally considered employees of the hospitals in which they work, and are paid in exchange for the extensive and valuable medical services they render. In other words, the "quo" of payments is given in return for the "quid" of services.

*Rosenthal v. Commissioner*, 63 T.C. 454 (1975), a case with facts strikingly similar to the present action, is representative of the many decisions involving residents handed down since *Bingler*. The taxpayers in *Rosenthal* were graduate M.D.s and candidates for advanced degrees in surgery at Marquette University. The graduate school operated the advanced degree program in affiliation with several major hospitals in the Milwaukee area, and the taxpayers were assigned to the various hospitals on a rotating schedule. Each received a uniform stipend that increased based solely upon his level of progression through the program. The taxpayers also received paid vacations, sick leave, and other fringe benefits. The clinical duties of the residents in the graduate program at Marquette therefore were similar to those carried out in the present case by the medical fellows at the University of Minnesota.

In holding against the taxpayers, the court in *Rosenthal* recognized those factors that were indicative of an employer-employee relationship, such as the receipt of fringe benefits by the taxpayers, as well as the fact that the stipends were not based upon individual need. However, as in *Bingler*, primary significance was placed upon the extent of valuable services the taxpayers rendered to the affiliated hospitals:

> Petitioners rendered extensive and valuable services to Milwaukee Hospital and Veterans Hospital, the effect of which was clearly to provide the "substantial quid pro quo" which the Supreme Court described in *Bingler v. Johnson, supra.* . . . If residents had not been available, Veterans Hospital would have had to employ additional physicians because residents rendered "much valuable service in the medical and hospital care of veteran patients." Similarly, in the ab-

sence of residents Milwaukee Hospital could have operated only if attending physicians had greatly increased their hours and workload or if other physicians were hired to replace the residents. . . . The purpose of the payments, therefore, was to provide compensation for services rendered.

### Application to This Case

*Rosenthal* and similar cases provide compelling support for the government's position in the present case. Plaintiffs, however, argue that this case is different than *Rosenthal* and most other § 117 resident cases. While plaintiffs admit that stipends received by ordinary residents are taxable, they assert that the medical fellowship program differs from a traditional residency in several material respects. First, they assert that they are not employees of the hospitals to which they are assigned. Second, plaintiffs maintain that the advanced degree program has a high academic emphasis and requires extensive original research, and that both the clinical and the research phases are designed to develop the fellows' academic and research skills. Finally, plaintiffs claim that the program is for the sole benefit of the fellows, that the hospital could easily function without the fellows at no additional expense, and that thus there is no quid pro quo between the stipends and services rendered. The court does not find these arguments convincing.

■ With respect to the lack of an employer-employee relationship, two observations are in order. The first is that the presence or absence of an employment relationship is not of controlling significance. Rather, the paramount consideration is whether the stipends were paid by the hospitals in return for valuable services rendered by the fellows. The second observation is that there are indeed indicators of an employer-employee relationship in this case. For example, the fellows receive fringe benefits from the hospitals, such as mal-

practice insurance, paid vacations, and free meals. Also, as in *Rosenthal*, the stipends are uniform and not based on personal need, and they increase as the fellows progress through the program; they thus have definite characteristics of an ordinary salary. Finally, the fellows generally are under the control and supervision of hospital staff physicians, the same as many other hospital employees.

■ Plaintiff's second argument, that the advanced degree program deserves different treatment than an ordinary residency program because of its heavy academic emphasis, also has little merit. The fact that medical fellows aspire to more lofty academic goals than do residents does not change the essential nature and value of the services they render, nor the motives of the hospitals for paying them. *Compare e. g., Woddail v. Commissioner*, 321 F.2d 721 (10th Cir. 1963); *Bonn v. Commissioner*, 34 T.C. 64 (1960). Moreover, given the similarity in the work done by residents and fellows in the hospitals, it would be anomalous to find that the stipends received by residents are taxable but those received by fellows are not. If the stipends paid by the hospitals were in exchange for valuable services of the fellows, then it makes little difference that fellows have more of an academic bent then residents or that fellows perform research projects while not at the hospitals.

■ Plaintiffs' final argument is that there is no quid pro quo in this case because the hospitals do not benefit from the activities of the fellows. Plaintiffs play down the value and extent of the services they perform, maintaining that the hospitals have no financial motive for paying their stipends, in that each of the hospitals has more than adequate staff available to handle all the health care responsibilities. As was mentioned earlier, the court rejects this factual assertion. It is clear to the court that the fellows provide substantial services to the hospitals and that the stipend grants

are paid by the hospitals in order to receive the services of the fellows. However, even assuming the hospitals could do without their fellows at no additional expense, the observations by the Tax Court in *Fisher v. Commissioner*, 56 T.C. 1201, 1215 (1971) are instructive:

> More fundamentally, even if the Center *could* do without residents, it did not do without them; it used their services, and it paid for them. Many employees may be dispensable in the sense that their employers could "operate" without them. But such dispensability hardly renders their salaries noncompensatory. (emphasis in original).

Thus, under the factual situation presented here, the court concludes that the sti-

pends received by the plaintiffs were not scholarships or fellowship grants. Plaintiffs provided substantial and valuable services to the hospitals in which they worked, and those services were given in return for the "stipend" payments they received.[2]

## CONCLUSION

Under the facts in this case, the court concludes that the stipends received by the plaintiffs were not scholarships or fellowship grants within the meaning of § 117 of the Internal Revenue Code. The clerk therefore is directed to enter judgment for the defendant United States. This memorandum and order shall constitute the court's findings of fact and conclusions of law.

---

**2.** After trial, the court addressed an inquiry to the parties on whether the stipends reasonably could be divided based on time spent on the clinical phase and time spent on the research phase, with the former representing compensation for services rendered to the hospitals and the latter representing true scholarships. *Compare Burstein v. United States*, 79-1 U.S.T.C. ' 9354 (Ct.Cl.1979); Rev. Rul. 73-368, 1972-2 C.B. 80. Both parties, citing *Leathers v. United States*, 471 F.2d 856, 861 (8th Cir. 1972), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2754, 37 L.Ed.2d 161 (1973), agreed that the advanced degree program must be viewed as a whole and that it would be improper to view part of the stipends as taxable and part as scholarships. The court therefore does not address this possible result. However, the plaintiffs in the many similar pending cases in this district are not precluded by this opinion from making such argument.