**Frederick W. JOHNSON and Mary M. Johnson, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 3–79–273.

United States District Court, D. Minnesota, Third Division.

Feb. 3, 1981.

Ronald Patrick Smith, St. Paul, Minn., Lawrence C. Brown and John S. Jagiela, Minneapolis, Minn., for plaintiffs.

Thomas K. Berg, U. S. Atty., Thorwald H. Anderson, Asst. U. S. Atty., Minneapolis, Minn. and David A. Slacter, U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM & ORDER

DEVITT, Chief Judge.

This is an action for a federal income tax refund in the amount of $2,651.84 for the calendar year 1974. During 1974 plaintiff Frederick W. Johnson was a Ph.D. candidate in surgery in the Graduate Program in Health Sciences at the University of Minnesota.[1] Plaintiff received a stipend from the

---

1. Plaintiff, Mary M. Johnson, is a party to this action solely because she filed a joint tax re-      turn with her husband for the 1974 tax year.

University of Minnesota during 1974 in the amount of $11,908.42. He excluded this amount from his gross income pursuant to I.R.C. § 117 in filing his 1974 return.

The District Director of Internal Revenue for the District of Illinois issued a Notice of Deficiency for $2,651.84. Plaintiff paid that amount and filed a claim for refund. This claim was disallowed and plaintiff filed this lawsuit.

The facts concerning the orientation and purposes of the University of Minnesota advanced degree program in the health sciences have been set forth in *Rockswold v. United States*, 471 F.Supp. 1385 (D.Minn. 1979), aff'd, 620 F.2d 166 (8th Cir. 1980). In that case, this court held that the stipend received by medical fellows enrolled in advanced degree programs at the University of Minnesota were not excludable from gross income pursuant to I.R.C. § 117. *Rockswold* fully sets forth the nature and scope of the clinical activities engaged in by the medical fellows for which they are compensated. In *Rockswold*, the plaintiffs took the position that the advanced degree program should be considered as a whole in determining whether or not the stipends received by medical fellows are "scholarships" or "fellowship grants" within the meaning of I.R.C. § 117.[2] In this case, however, the same counsel argues that the program should not be considered as a whole, but should be divided between clinical, academic and research activities and a partial exclusion allowed. We hold that the facts are substantially the same, the guiding legal principles the same, and that the advanced degree program is not divisible for the purposes of a Section 117 exclusion.

The parties have stipulated to a number of facts. In addition, a one-day court trial was held at which testimony was heard and a number of exhibits received. The parties' stipulation of facts (Clerk's Entry # 14) is incorporated by reference into this decision.

The University of Minnesota is an educational institution within the meaning of I.R.C. § 170(b)(1)(A)(ii). The plaintiff is a cash basis calendar year taxpayer, and during 1974 was a candidate for a degree within the meaning of I.R.C. § 117(b)(1). Because the University operates on a typical academic year, stipends are granted for periods running from July 1 of each year until June 30 of the following year.

For the academic year 1973–74, plaintiff was awarded a National Institute of Health training grant in the amount of $10,000 and a grant from the Abbott Hospital Educational Fund in the amount of $1,700. For the academic year 1974, plaintiff received a stipend in the amount of $12,200 consisting of a National Institute of Health training grant in the amount of $8,800, and a grant from the University of Minnesota Educational Fund in the amount of $3,400. The total amount actually received by plaintiff in the 1974 calendar year was $11,908.42.

In its advanced degree program in surgery, the University has combined a traditional residency program, in which physicians obtain the training and experience necessary to become certified in a medical specialty, with an academic and research program. The ultimate aim of the program is to train physicians both for the practice of surgery and for positions in academic surgery and research.

In order to practice as a surgeon, a physician must be certified by the American Medical Association's (AMA) Committee on Graduate Education in Surgery. Under AMA standards, a minimally acceptable program must provide four years of clinical experience. Because of the additional research and academic requirements, completion of the advanced degree program at the University of Minnesota results in both board certification as a surgeon and a Ph.D. or Master of Science degree in Surgery. Virtually all participants in the advanced degree program become board certified sur-

---

References in this opinion to "plaintiff" are to Frederick W. Johnson.

**2.** In plaintiffs' supplemental brief at 666, submitted in the *Rockswold* case, plaintiffs forcefully argued, "[S]uch an allocation is not required nor is it legally permissible under Section 117 in cases such as the present cases."

geons. In the instant case, plaintiff became certified as a surgeon but did not complete his Ph.D. degree. Plaintiff chose a career in private practice over one in academic surgery.

The advanced degree program in surgery involves six to eight years of clinical, research, and academic activities. The first three years of the program are spent in clinical activities and formal coursework. The fourth and fifth years are normally spent engaged in research activities and formal coursework, although some medical fellows combine clinical and research activities during this period. Some fellows spend an additional year engaged in research. Following the completion of the research portion of the program, fellows return to the clinical phase, during which they have intensive surgical operative experience under supervision and rotations to various hospital services. Consistent with the requirements of the AMA Committee on Graduate Medical Education, during the final year of clinical activity, a fellow is designated a chief surgical fellow and is responsible for the conduct of a general surgical service.

During the research phase of the program, fellows are required to undertake original investigative research in either experimental or clinical surgery. This research is not a prerequisite for certification as a surgeon by the American Board of Surgery.

Upon entering into the research phase of the program, the plaintiff spent an initial period of time working with other students on an ongoing research project in order to become familiarized with research techniques in the laboratory, such as the use of instrumentation and setting up the experimental model. Following this period of orientation, the plaintiff's research activities were confined to his own projects, although from time to time his research advisor, Associate Professor Dr. Demetre Nicoloff, would offer him suggestions and guidance. The plaintiff was free to select a research project within his area of interest and academic expertise, and a majority of his research time was spent researching problems within the scope of his project.

Plaintiff's research was conducted in the University of Minnesota Research Laboratories. Regular hours are kept during this time; plaintiff engaged in research Mondays through Friday from approximately 7:00 A.M. to 4:30 P.M. Occasionally, an experiment would require plaintiff to spend evenings at the lab.

Plaintiff's research experiments never involved human subjects, although ideas for research conducted in the advanced degree program in surgery often are derived from clinical experiences in the hospital. Medical fellows generally are involved in the treatment of patients with unusual symptoms or problems during their clinical experience. University of Minnesota Hospitals is primarily a tertiary care facility; it provides care to patients who are in need of specialized care or who present unusual and/or difficult medical problems. Some techniques developed by plaintiff in his research have been applied at the University Hospitals. The parties agree that the research performed by the fellows makes them better physicians.

The president of the University, Dr. C. Peter Magrath, testified that research is one of three main missions at the University. The University was awarded approximately 92 million dollars in federal research grants during its last fiscal year. The funding of the research labs comes mainly from state, federal and private sources. The state primarily funds undergraduate medical education. Competition for federal and private research funds is keen. Criteria used in distributing research grants include scientific merit, the reputation of the individual investigator, the potential of persons working with the investigator (including medical fellows), and the reputation of the faculty and institution. Grants are always awarded to the University itself and not in the name of any particular individual.

Research grants are awarded to defray both the indirect and direct costs of research. Indirect costs are the overhead associated with operating the laboratory. Di-

rect costs include, *inter alia*, the payment of stipends.

In addition, medical fellowship stipends are funded in large part by local hospitals that receive the services of the medical fellows during their training. Persons accepted into the advanced degree program in surgery virtually automatically receive stipends for the whole period in which they are enrolled in the program. The stipends are not based on individual need and are in an amount equivalent to that paid to those enrolled in residency programs in the midwest. Stipends are automatically increased each year a fellow participates in the advanced degree program.

Plaintiff testified that during the first six months of 1974, it was his recollection that 83 percent of his time was spent engaged in pure research, and 17 percent was spent engaged in formal course work in the basic sciences, in satisfaction of the requirements for the Ph.D degree. During the second half of 1974 plaintiff testified he spent 50 percent of his time involved in patient diagnosis and medical and surgical procedures, 19 percent involved in clinical studies and research, 11 percent involved in formal clinical conferences, and 20 percent involved in manuscript and thesis preparation of articles for publication.

Plaintiff takes the position that, based upon his estimation of time spent in research, academic, and clinical activities, at least 60 percent of the stipend amounts received by him during the calendar year 1974 are excludable from gross income pursuant to I.R.C. § 117. The government argues that the issue of excludability of the stipends should be resolved by considering the residency program as a whole. The government's position is that since the majority of the residency program involves clinical activities, and since this court has determined that the monies received by the medical fellows are a *quid pro quo* for their clinical services, *see Rockswold v. United States*, 471 F.Supp. 1385 (D.Minn.1979), no portion of the stipend may be excluded from plaintiff's gross income.

Amounts paid for services or primarily for the benefit of the grantor which rep-resent either compensation for past, present, or future services or represents payments for services which are subject to the direction or supervision of the grantor shall not be considered to be amounts received as a scholarship or fellowship grant. Treas.Reg. § 1.117–4(c). The test to be applied in determining whether or not amounts received are "scholarships" or "fellowship grants" is whether the amounts paid are "relatively disinterested, 'no strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients." *Bingler v. Johnson*, 394 U.S. 741, 751, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969).

In making the determination whether or not a recipient has furnished a substantial *quid pro quo* for amounts received, the Eighth Circuit has adopted the principle that a medical residency must be considered as a whole. *Leathers v. United States*, 471 F.2d 856, 861 (8th Cir. 1972).[3] *See also Burstein v. United States*, 622 F.2d 529 (Ct.Cl.1980); *Woddail v. Commissioner*, 321 F.2d 721, 724–725 (10th Cir. 1963); *Koch v. Commissioner*, 38 T.C.M. (CCH) 650, 653 (1979).

A medical residency program is not divisible into activities which are program requirements and those which are merely compensable services required in order to receive a stipend. All activities are required for completion of the residency program. This can be contrasted to the situation presented in *William R. Fulton v. Commissioner*, 38 T.C.M. (CCH) 1046 (1979), a case cited by plaintiff in support of his position that the medical residency program should be divided into research, academic and clinical activities. The petitioner in *Fulton*, a Ph.D. degree candidate, was awarded a stipend on the condition that he devote one-half of his time to non-thesis research designed to satisfy contractual commitments between the University of Nebraska and the Nebraska Department of Agriculture. The non-thesis research performed in *Fulton* was not a degree requirement; it was not part of the academic

---

**3.** Plaintiffs in the *Rockswold* case, represented by the same counsel, placed heavy reliance on *Leathers* in arguing that the program must be viewed as a whole.

program. Moreover, the IRS agreed that one-half of the stipend in *Fulton* was excludable.

Here we have an entirely different set of circumstances. A medical fellow enrolled in the advanced degree program is required to complete the research, academic, and research requirements in order to obtain an advanced degree in surgery. The clinical experiences of the fellows provide them with ideas and background for their research activities, and the research activities in turn produce better practicing surgeons.

The hospitals which provide funding for the stipends undoubtedly also receive the benefits of the academic and research activities of the medical fellows insofar as these activities produce highly qualified surgeons. The manner in which the funds providing the stipends are distributed support this conclusion, and also illustrates the impossibility of dividing the advanced decree program into its component parts. The funds from which the plaintiff was paid from January 16, 1974 to June 30, 1974, during which he said he was engaged solely in research and academic activities, came from the Abbott Hospital Education Fund. Abbott Hospital funds stipends pursuant to an affiliation agreement with the University. Pursuant to this agreement, the hospital agrees to fund a certain number of stipends, based on the number of medical fellows assigned to the hospital for clinical activities. Thus, we conclude that Abbott Hospital funded plaintiff's stipend, not for the purpose of enabling him to engage in research, but to provide compensation for the clinical services received by the hospital from the medical fellows. Moreover, the NIH training grants, which plaintiff has argued are exclusively research grants, funded plaintiff's stipend for both his clinical and research activities during 1974.

The amount of stipends received by the fellows is another factor pointing to the wisdom of the *Leathers* principle requiring consideration of the advanced degree program as a whole for the purposes of a Section 117 exclusion. The automatic increases received by medical fellows each year do not depend in any way on the type of activities in which a fellow is engaged. Increases based solely on tenure are a common indicator that a payment is in the nature of compensation. *See, e. g., Burstein v. United States*, 622 F.2d at 538. Had the plaintiff engaged in both clinical and research activities concurrently during a particular year, or had he entered into a particular phase of the program in one year as opposed to another, or engaged in three years of research instead of two years, the amount of his stipend would be unaffected.

In the *Rockswold* case, we held that, considering the program as a whole, the stipends paid to medical fellows participating in the University of Minnesota advanced degree program in surgery were not excludable from gross income under I.R.C. § 117. We hold here, on substantially the same facts involving the same program, that plaintiff performed substantial services for the University and the cooperating hospitals, and thus amounts received as stipends were compensation for past, present, and future services. Applying the controlling principle from *Leathers v. United States*, 471 F.2d 856 (8th Cir. 1972), we hold that the advanced degree program in surgery is not divisible for the purpose of establishing an exclusion under I.R.C. § 117.

These expressions shall constitute the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.