MOHAMED EL DEEB and FARIDA A. TAWFIK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
El Deeb v. Commissioner
Docket No. 1818-82.
United States Tax Court
T.C. Memo 1984-205; 1984 Tax Ct. Memo LEXIS 463; 47 T.C.M. (CCH) 1603; T.C.M. (RIA) 84205; April 24, 1984. Kathryn J. Sedo,David John Dabill, and Sheryl Walter, for the *464 petitioners. Dale L. Newland, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for tax years ended December 31, 1978 and December 31, 1979, in the respective amounts of $978 and $906. The sole issue for decision herein is whether petitioners may exclude from their gross income, pursuant to section 117, [1] certain payments received by petitioner Mohamed E1 Deeb while he was a candidate for a Master of Science in Dentistry degree at the University of Minnesota. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Mohamed El Deeb (hereinafter referred to as "petitioner") resided in Minneapolis, Minnesota at the time of filing the petition herein. Farida A. Tawfik (hereinafter referred *465 to, together with petitioner, as "petitioners") is a party to this proceeding solely by reason of filing joint Federal income tax returns during the years in issue with petitioner, who was her husband at those times. For tax years ending December 31, 1978 and December 31, 1979, petitioners filed their Federal income tax returns with the Internal Revenue Service Center in Ogden, Utah. Petitioner completed five years of dental school followed by a one-year dental internship in his native country, Egypt. Following his internship, petitioner undertook a two-year training program at El Azhar University in Egypt, during which time he served, first, as an instructor in oral surgery, and later, as an assistant lecturer at that school. At all times here pertinent, petitioner did not have a D.D.S. degree, and was not licensed to practice dentistry in the United States. In 1975, Dr. Daniel Waite, chairman of the Division of Oral and Maxillofacial Surgery at the dental school at the University of Minnesota (hereinafter referred to as "university"), was on sabbatical leave in Egypt. During his visit, Dr. Waite lectured at El Azhar University, where petitioner was one of his students. *466 Petitioner spoke English poorly at that time, but through interpreters, he and Dr. Waite became acquainted. Dr. Waite was impressed with petitioner's intellectual curiosity, and with strong endorsements of petitioner's work provided by faculty members and administrators at El Azhar University. With Dr. Waite's assistance, petitioner came to the United States in January 1976 with the objective of obtaining both clinical training and research experience at the University's dental school. For his first six months at the University, petitioner was enrolled in a probationary "adult special" program, during which time he participated in courses and clinical training. During this period, petitioner received no financial aid from the University. During the fall of 1976, petitioner was admitted to the Master of Science in Dentistry degree program in the Department of Oral and Maxillofacial Surgery at the University (hereinafter referred to as the "Program"), where he remained a candidate for such degree throughout the years there in issue. During such years, the University qualified as an educational organization described in section 170(b)(1)(A)(ii). The graduate program in oral *467 surgery at the University, of which the Program was a part, was intended to meet several objectives, as follows: (1) To fulfill the requirements for advanced training in oral surgery as provided by the Council of Dental Education of the American Dental Association; (2) to fulfill the University's requirements for a Master of Science in Dentistry degree; (3) to fulfill the requirements for a minor in a clinical science for students pursuing a Ph.D. degree with a major in one of the basic sciences or related fields; and (4) to fulfill eligibility requirements for examination by the American Board of Oral Surgery. Petitioner entered the Program together with three American students, each of whom had obtained his D.D.S. degree and license to practice in this country. While full dental fellowships were provided for each of the three American students throughout the duration of their enrollment in the Program, petitioner received no financial aid for approximately his first ten months in the Program. [2] Each such fellowship initially provided its recipient with an annual stipend in the amount of $10,000, and this amount increased, in annual increments of $1,000, in each succeeding year *468 the student remained in the Program. Such full dental fellowships were funded by hospitals which were affiliated with the University. In or about July 1977, petitioner began *469 to receive financial aid from the University in the form of a "twenty-five percent dental fellowship." Such partial fellowship provided petitioner with an annual stipend in the amount of $3,000. [3] Apart from this stipend, petitioner undertook the Program at his own expense for over one year. At some point during early 1978, petitioner began to receive additional financial assistance, and he continued to receive such additional assistance throughout the remainder of his enrollment in the Program. This additional assistance resulted from petitioner's appointment to a half-time research assistant position, which was funded through a grant provided to the University by the National Institute of Dental Research (hereinafter referred to as "NIDR"). Pursuant to this appointment, petitioner received a stipend in the amounts of $6,153 in 1978, and $4,674 for the portion of the year he was enrolled in the Program in 1979. [4] The combined amount of petitioner's stipend and *470 twenty-five percent dental fellowship for each year he was in the Program, however, was less than the amount of the full fellowship being received by each of the other students in his entering class. *471 The amount of the stipends for research assistants increased annually based only upon tenure.Neither the award nor the amount of dental fellowships or stipends, however, was based upon the financial needs of the individual recipients. The position of research assistant was one of several funded graduate assistant appointments for which a student was eligible upon admission to the University's graduate programs. Other such appointments included project assistants, teaching assistants and associates, and administrative fellows. These graduate assistant positions fulfilled the dual functions of providing various units of the University with the instructional and research staff needed to accomplish their educational missions, and offering to the graduate student both financial assistance and the opportunity to obtain professionally related experience. In order to qualify for an appointment to any such position, a graduate student was required to be enrolled in a degree program, and to be making satisfactory progress toward the award of such degree. The role of research assistants, as distinguished from project assistants, was described in the official University Handbook for Graduate *472 Assistants for the years 1979 through 1981, as follows: The research assistant's and project assistant's activities are connected with research studies assigned by the supporting department or principal research investigator. The assignments, which vary considerably between programs, include the following: perform independent or collaborative research, collect research material, take field notes, record and analyze data, perform analytical work, conduct library searches, prepare bibliographies and abstracts, and do editorial work. Because these activities may or may not be directly related to the assistant's own thesis research, two appointment titles have been established to distinguish between thesis-related and non-thesis-related work. The research assistant's work partially fulfills degree requirements; the project assistant's work consists of special duties on research projects where the work is not part of the thesis research. As a graduate assistant with a research assistant appointment, petitioner was considered part of the academic staff of the University, and he received several benefits in connection with such status. First, petitioner paid lower in-state tuition *473 rates, and this privilege extended to members of his immediate family. Second, petitioner was eligible for workmen's compensation benefits. Third, petitioner was provided with shared office space. Fourth, petitioner was entitled to certain formal procedures governing grievances and dismissals. Only graduate assistants holding in excess of half-time appointments, which did not include petitioner, were entitled to group health, dental and life insurance benefits. Graduate assistants were paid by check through regular employee payroll channels at the University, and Federal taxes were withheld from those checks.Graduate assistants received no formal sick or vacation leave. The course of study in the Program consisted of four principal areas -- research, including preparation and defense of a thesis, teaching, clinical work and courses. Academic credit was provided for all required research, clinical work and courses, but not for teaching. In or about March 1977, petitioner began to search for a research project to fulfill the research and thesis requirements of the Program.In consultation with Dr. Maury Meyer in the University's physiology department, who became his research *474 director, petitioner selected a basic research project in the area of blood flow in monkeys following osteotomatic surgery. The results of petitioner's research were ultimately utilized and presented in his thesis, which was entitled "Blood Flow Study in Monkeys Following a LeFort I Osteotomy Down Fracture Technique." Petitioner described the subject of such thesis as follows: [W]e had planned to use either ten or twelve monkeys. * * * [B]asically, in simple terms, I separated their upper jaw from the rest of the skull. And then following that I have two groups of monkeys, one we waited two weeks, and the other we waited six weeks following doing the surgery.And by using * * * the radioactive microfield's methods we quantitated [sic] the blood flow to different tissues. * * * So, basically, it is studying physiology. How this tissue, or how the blood flow to this area has been regenerated * * * after certain * * * periods. While Dr. Meyer was principally responsible for the foregoing research project, petitioner performed surgery on the subject monkeys, analyzed literature and data, wrote his thesis, defended it before a University committee, and presented it at several *475 national and international conferences. Petitioner also authored several publications relating to his research, in which he credited Dr. Meyer and Dr. Waite as coauthors. Petitioner was not obligated to provide the results of his research to anyone.
The research conducted by petitioner was of superior quality, and had the effect of enhancing the reputation of the University, thus giving it an edge in the characteristically tight competition for research funds. In addition to the foregoing research work, students in the Program were required to teach medical students on their hospital rounds and to teach both in the operating rooms and in seminars and laboratories. Like faculty members, students in the Program were critiqued by their own students on their teaching performances. Petitioner described his teaching responsibilities as follows: Part of it was instructing undergraduate students in the clinic. And there is always more than one person in the clinic. There is a staff there all the time. And you teach the undergraduate students, or advise them actually, of how to do certain kinds of -- like for example, extractions. I'm just giving you an example. And you supervise *476 them, explain to them, you discuss with them the treatment plan at the beginning before they start. And then you supervise them during their procedures. And if you have to take over and show them how, then you go back again and give them the chance to do it. This is part of it. Teaching was probably providing some seminars related to -- I'm just giving an example -- wiring -- how to tie wire around the teeth in case of a vast dentation -- various kinds of seminars sometimes -- various kinds of instructions. You try to teach your colleagues as well. Students were also required to participate in the clinical component of the Program, which began in the first year with three months of general orientation, including rotations at hospitals affiliated with the University, and oral surgery outpatient clinic, lectures and seminars. The remaining nine months of the first year were devoted to operating room assistance and oral surgery clinic, as well as basic science courses and research. Clinical training during the second year of the Program included a four month rotation in general anesthesia at the University's hospitals, a four month surgical rotation at Fairview Hospital in *477 Minneapolis, and a four month rotation at the Veteran's Administration Hospital in Minneapolis, the major portion of which was spent in the oral surgery clinic and in the operating room. Training during the third year of the Program included a four month rotation as chief resident at the University's hospitals, an assignment as chief resident at the Hennepin County General Hospital, and a four month rotation at the St. Paul-Ramsey County Hospital. While petitioner met all of the clinical requirements of the Program, because of his disparate experience and lack of American licensure, his participation in clinical work was somewhat more restricted than that of this licensed colleagues in the Program. Petitioner was not permitted to see patients on his own, was not permitted to accept senior residencies at hospitals affiliated with the Program, was more closely surpervised while working with faculty and staff, and performed fewer surgical procedures than did other students in the Program. In addition, petitioner's patients were always apprised of his lack of licensure prior to treatment. When he completed the Program, petitioner had insufficient clincical experience to obtain board *478 certification in oral surgery. Finally, students in the Program were required to take at least eighteen quarter credits of their study program in the major field of oral surgery, and to take no less than nine quarter credits in a minor subject, which was usually anatomy, and petitioner complied fully with these requirements. On June 9, 1979, petitioner was granted the Master of Science in Dentistry degree from the University's dental school. As of the time of the trial in this matter, petitioner served as an assistant professor and director of the research program in the Department of Oral and Maxillofacial Surgery at the University, and petitioner had taken his dental board examinations. Determining that the research assistant stipend and partial dental fellowship received by petitioner during 1978, in the respective amounts of $6,153 and $3,000, and the research assistant stipend received by petitioner during 1979, in the amount of $4,674, did not qualify as excludable scholarships or fellowships under section 117, on October 29, 1981, respondent determined the afore-described deficiencies against petitioners. OPINION The sole issue for our decision is whether payments *479 received by petitioner while he was a candidate for a Master of Science in Dentistry degree at the University, are excludable from petitioners' gross income under section 117(a). Section 117(a) excludes from the gross income of an individual any amount received as a scholarship or fellowship grant. In the case of an individual who is a candidate for a degree, this general exclusion is limited by section 117(b)(1). [5] However, such limitation, and the exception contained therein, is only applicable if the payment in question first has been found to constitute a scholarship or fellowship grant. Reese v. Commissioner,45 T.C. 407, 413 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). *480 The terms "scholarship" and "fellowship grant" are not defined in the statute. Section 1.117-3(c), Income Tax Regs., defines "fellowship grant" as an amount "paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." The regulations define "scholarship" in a similar manner. Section 1.117-3(a), Income Tax Regs.
The test to be applied is whether the primary purpose underlying the payment was to educate the recipient or whether it was to compensate him for services rendered. Yarlott v. Commissioner,78 T.C. 585, 595 (1982), affd. 717 F.2d 439 (8th Cir. 1983); Weinberg v. Commissioner,64 T.C. 771, 776 (1975). Thus, if an amount paid "represents either compensation for past, present, or future employment services," then such amount is not to be considered as an amount received as a scholarship or a fellowship grant for purposes of section 117. Section 1.117-4(c), Income Tax Regs. The validity of section 1.117-4(c), Income Tax Regs. *481 , was upheld in Bingler v. Johnson,394 U.S. 741, 751 (1969), wherein the Supreme Court declared: [T]he definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no-strings" educational grants, with no requirement of any substantial quidproquo from the recipients. Our inquiry is accordingly reduced to whether the payments made to petitioner during 1978 and 1979, were intended primarily to be in return for his services, or to furnish him with an opportunity to further his education for his own benefit. Petitioners bear the burden of proof in this respect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). In the present case, unlike each of his colleagues who received a full dental fellowship throughout the duration of his enrollment in the Program, we have found that petitioner received: (1) No funding, from the fall of 1976, when he commenced the Program, until July 1977; (2) a twenty-five percent *482 dental fellowship from July 1977 until June 9, 1979, when he received his degree; and (3) a stipend pursuant to his appointment as a research assistant, from early 1978 until June 9, 1979. We accordingly proceed to separate considerations of the excludability under section 117(a) of these two categories of payments, in light of the legal principles described above. I. The Partial Dental Fellowship
The nature of the partial dental fellowship received by petitioner in 1978 is explained on this record solely by the following testimony by Dr. Waite: Q Dr. El Deeb received some money under this dental fellow [sic]. Why did he start receiving that money? A Our new Dean, who came a couple of years previous to that decision -- at no time did graduate students in the dental school every [sic] receive a quote, "teaching assistant salasry", or a portion of their income had never -- they had never received any income for their teaching responsibilities which we think are an important part of learning. And that's not true of the oral surgery residents that you talked about earlier, who [are] in the hospital receiving stipends. I am speaking about the orthodontic graduate *483 student, the periodontic graduate student, and certain graduate students like Dr. El Deeb, who are involved, as part of their responsibilities, in literally teaching undergraduate students. In other words, we think that if you can tell something really well to somebody else that's less educated than you are, that's a good learning experience. Q So that, in a sence, it's an academic requirement? A This has always been a requirement. But nobody received anything for it until whatever that date was.
And then every graduate student in the dental school received, I think it was $2500,[6] as a teaching -- as a part of their educational component in the teaching area. [Emphasis added.] We take Dr. Waite's foregoing testimony as an admission that the twenty-five percent dental fellowship was paid to petitioner solely in connection with his teaching responsibilities in the Program. As we have found, those responsibilities included instructing undergraduate students in clinics and seminars, supervising such students during dental procedures, teaching medical students on hospital rounds, and teaching in the operating rooms and in laboratories. The compensatory nature *484 of these payments is suggested by the facts that neither the award nor the amount of petitioner's dental fellowship was based upon his financial need, see Meehan v. Commissioner,66 T.C. 794, 806 (1976), [7] and that academic credit was singularly denied for the teaching component of the Program. [8]
Petitioners have failed to adduce any evidence herein to show that the manifold teaching responsibilities described by Dr. Waite were either insubstantial or intended principally to benefit petitioner in his studies. On this meager record, we accordingly hold that the partial dental fellowship received by petitioner in 1978, in the amount of $3,000, was intended to compensate him, at least in part, for the substantial teaching services he provided for the benefit of the University, and that it is includable in petitioners' gross income for that year. II. The Research Assistant Stipend
We turn next to the research assistant *485 stipend received by petitioner and excluded by petitioners from their gross income in both 1978 and 1979. Petitioners, relying principally upon two Memorandum Opinions of this Court, Langley v. Commissioner,T.C. Memo. 1982-460, and Pozar v. Commissioner,T.C. Memo. 1980-559, emphasize that the funding provided to petitioner by way of his research assistant appointment was intended solely to assist him in pursuing his degree-oriented research, rather than to compensate him for any services provided to the University. Respondent, on the other hand, citing a long line of cases denying under section 117 the excludability of stipends received by medical interns and residents, and relying in particular upon Yarlott v. Commissioner,supra, answers that, in evaluating the purpose for the research assistant stipend provided to petitioner, the Program must be viewed as a unitary whole, and that, when so viewed, the apparent quidproquo inherent in such stipend becomes apparent. We agree with respondent. In Yarlott v. Commissioner,supra, facing the issue of the excludability under section 117 *486 of a medical fellowship received by a graduate medical student during the academic phase of a surgery program at the University of Minnesota, this Court held that such program, including both its clinical and academic phases, must be viewed as an indivisible whole. Since, when so viewed, the surgery program in that case involved substantial clinical services, we held that the fellowship payments in issue failed to qualify under section 117. In so holding, we relied upon a number of cases, upholding the unitary approach in connection with the analysis under section 117 of funding provided in medical and dental graduate degree programs at the University of Minnesota and elsewhere. See Leathers v. United States,471 F.2d 856, 861 (8th Cir. 1972), cert. denied 412 U.S. 932 (1973); Johnson v. United States,507 F. Supp. 663 (D. Minn. 1981); Rockswold v. United States,471 F. Supp. 1385 (D. Minn. 1979), affd. 620 F.2d 166 (8th Cir. 1980). [9]
Since Yarlott, we *487 have continued to apply the unitary approach in evaluating the excludability under section 117 of medical fellowships received by participants in graduate medical programs at the University of Minnesota. [10]
Petitioners seek to distinguish Yarlott and the other related residency cases, on the basis that the research assistant stipend which is here in issue related solely to the research component, and not to the clinical or teaching components of the Program. Thus, as we have found, the role of the research assistant was defined by the University solely in terms of the student's participation in his thesis-related research assignments, and not in terms of either clinical assignments, or, as contrasted with graduate assistant appointments of the teaching assistant and teaching associate types, teaching assignments. It is clear, however, that this characterization of the stipend by the University will be insufficient to meet the requirements of section 117 in the face of facts and circumstances indicating *488 the contrary.See Burstein v. United States,622 F.2d 529 (1980). [11] For several reasons, we hold that such facts and circumstances are present herein. First, each of the four components of petitioner's degree program -- clinical, research, teaching and course work -- was an integral part of the whole. Thus, as we have found, satisfactory completion of each of these components was a prerequisite for petitioner's continuation in the Program, and for his eventual receipt of the Master's Degree in Dentistry, [12] a clear indication of the unitary character of the Program. Yarlott v. Commissioner,supra,78 T.C. at 599. Unlike the program in issue in Yarlott, moreover, which consisted of sequential clinical and academic phases, the components of the present program proceeded concurrently throughout its duration. While petitioner was receiving the stipend payments in issue during 1978 and 1979, therefore, he was involved not only in research for his thesis, but also in the clinical, teaching and course work described in some detail in our findings. *489 Second, petitioner's continued funding under his research assistant appointment was predicated upon his participation in each of the foregoing components of the Program. This conclusion results from our dual findings that the research assistant appointment required petitioner to be enrolled in a degree program, making satisfactory progress toward the award of such degree, and that petitioner's degree program required his completion of each of its clinical, research, teaching and course components. The integrated nature of the Program together with the linkage of petitioner's research assistant appointment, and accompanying stipend, to his satisfactory participation in each component thereof, provide the facts and circumstances which compel our evaluation of such stipend as relating to the Program as an indivisible whole. See Dietz v. Commissioner,62 T.C. 578, 585 (1974). [13] See also Burstein v. United States,supra at 537-538. In evaluating the purpose underlying petitioner's funding as a research assistant, we must accordinly take account of any services he was required to perform pursuant not only to the research component, but also *490 to the clinical, teaching and course components of such Program. We have already found, in some detail, the clinical activities which were performed by petitioner pursuant to his enrollment in the Program. Without reiterating such activities, we believe that their nature and extent clearly bring them within the ambit of Yarlott, and other medical and dental residency cases holding that payments were intended to be primarily in return for substantial services to be performed by the recipient resident. See Johnson v. United States,supra;Rockswold v. United States,supra.[14] In so holding, we are mindful that petitioner's clinical activities were somewhat constrained by his educational background and lack of American licensure. Nonetheless, petitioner performed all of the required clinical services *491 in the Program, and the magnitude of his compensation, which, as we have found, was lower than that of the other participants in the Program, apparently reflected the value of his restricted clinical capabilities to the University. Consistent with this determination, this record discloses the presence of a number of other indicia of compensation in connection with petitioner's research assistant stipend. First, neither the award nor the amount of such stipend was based upon financial need, and such stipend increased annually based solely upon tenure in the Program. See Yarlott v. Commissioner,supra,78 T.C. at 602; Dietz v. Commissioner,supra at 586. Second, petitioner was considered to be part of the academic staff of the University, and he received certain fringe benefits from the University in connection with that status, including lower, instate tuition rates, eligibility for workmen's compensation, *492 shared office space, and formal procedures governing grievances and dismissals. Third, petitioner's stipend was paid through the University's regular employee payroll channels, and was subject to Federal income tax withholding. While we accordingly conclude that the research assistant payments to petitioner were primarily intended to compensate him for his substantial clinical services to the University, [15] we note, additionally, that aspects of petitioner's research activities were also suggestive of a substantial quidproquo. In this regard, the following language from our holding in Yarlott v. Commissioner,supra,78 T.C. at 603, applies with equal force herein: In addition to the indirect benefits that accrue to the hospitals as a result of a medical fellow's training during the academic phase, the activities of the fellow during such time also confer a direct benefit on the university.* * * [P]ublications resulting from [research performed by a medical fellow] credit the student's research adviser, who offers suggestions and guidance during the course of the research, with being a coauthor of the paper. * * * Finally, distinguished *493 research has the effect of enhancing the reputation of the university, which, in turn, gives the university an edge in the characteristically tight competition for research funds. Although such direct benefits do not decisively establish a compensatory arrangement, when examined in light of the entirety of the [Program], they do contribute to the compensatory character of the stipend payments. On this record, we find that the Program, as a whole, involved substantial services and thus the primary purpose underlying the dental fellowship and research assistant stipend in issue was to compensate petitioner for services *494 rendered. Therefore, such payments are includable in petitioners' gross income. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All statutory references herein are to sections of the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all references to Rules are to the Tax Court Rules of Practice and Procedure, unless otherwise stated.↩
2. The sole testimony concerning the disparate treatment accorded petitioner with respect to financial aid was provided by Dr. Waite, and that testimony was vague and inconsistent. Dr. Waite testified, first, that petitioner failed to receive a dental fellowship when he commenced the Program because he was a foreign student, who was not licensed to practice dentistry in this country, and who had limited potential for immediate patient involvement. Later, Dr. Waite indicated that petitioner failed to receive such a fellowship because the authority which accredited the dental school would permit only three students entering the Program to be so funded, and that (for unexplained reasons) petitioner was considered to be the fourth such student. While there may be some basis for reconciling these two theories, on this record petitioners have failed to provide that basis, and we are unable to find the reason for petitioner's failure to receive a full dental fellowship at the time he commenced the Program.↩
3. Dr. Waite testified that he believed that such fellowship was in the annual amount of $2,500. We find more credible, however, petitioner's testimony that such fellowship was in the annual amount of $3,000.↩
4. Our examination of petitioners' tax return for 1978, which was entered into evidence herein, discloses that petitioners excluded, purportedly as a research assistant stipend, the entirety of the amount which they reported as having been received by petitioner from the University in that year, or $9,153. Petitioner testified, however, that such stipend was "in the range of $6,000," and that his dental fellowship was in the annual amount of $3,000.For tax year 1978, we accordingly find that petitioner received and that petitioners excluded from gross income, both a research assistant stipend in the amount of $6,153 and a dental fellowship in the amount of $3,000. In the absence of any other evidence on this point for 1979, however, we have decided to accept the statement appended to petitioners' tax return for that year, which was also entered into evidence herein, that petitioner "received a stipend of $4,674.00 as a Research Assistant from January 1, 1979, through June 30, 1979." Further, respondent proposed that we find herein that "Petitioner did not claim an exclusion for his Dental Fellowship received in 1979 although he did claim it for 1978," and petitioners have apparently failed to object to this proposed finding. For tax year 1979, we accordingly find that, while petitioner received both a dental fellowship in an undisclosed amount and a stipend in the amount of $4,674, for the portion of such year that he was in the Program, petitioners excluded from their gross income for that year only the amount of such stipend.↩
5. Sec. 117(b)(1) provides as follows: Sec. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS (b) Limitations.-- (1) Individuals Who Are Candidates For Degrees.--In the case of an individual who is a candidate for a degree at an educational organization described in section 170(b)(1)(A)(ii)↩, subsection (a) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant. If teaching, research or other services are required of all candidates (whether or not recipients of scholarships or fellowship grants) for a particular degree as a condition to receiving such degree, such teaching, research, or other services shall not be regarded as part-time employment within the meaning of this paragraph.
6. We have found that such fellowship was actually in the annual amount of $3,000. ↩
7. See also McKenna v. Commissioner,T.C. Memo. 1979-370↩. 8. Compare Langley v. Commissioner,T.C. Memo. 1982-460↩.
9. See also Nino v. Commissioner,T.C. Memo. 1980-204; Koch v. Commissioner,T.C. Memo. 1979-147↩.
10. See Kersten et al. v. Commissioner,T.C. Memo 1984-204, decided on this same date; Gomes v. Commissioner,T.C. Memo. 1983-292↩.
11. See also Ellenwood v. Commissioner,T.C. Memo. 1982-137↩.
12. As succinctly noted by petitioners, on brief, "[e]ach degree candidate is obligated to complete all components of the program in order to receive the degree."↩
13. Compare Batson v. Commissioner,T.C. Memo. 1977-339 (holding excludable as a scholarship under sec. 117↩, a research associate stipend received by the taxpayer during a surgical residency at the Louisiana State University School of Medicine, where the funded research was not part of a graduate degree program).
14. See also Kersten et al. v. Commissioner,supra;Gomes v. Commissioner,supra;Nino v. Commissioner,supra;Koch v. Commissioner,supra.↩
15. We do not find it consequential herein that petitioner's stipend derived from an NIDR grant to the University, but that Petitioner's services benefitted various hospitals which were affiliated with the University. As we noted in Yarlott, "we believe that the university and affiliated hospitals should be viewed as inseparable parts of an interrelated and interdependent residency program. Accordingly, these institutions jointly constitute 'the grantor' of the stipends." Yarlott v. Commissioner,supra,78 T.C. 585, at 603↩ n. 18 (1982).